## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

IN RE: §
 §
HELIA TEC RESOURCES, INC., § CASE NO. 13-36251
 § Chapter 11
 Debtor § Judge David Jones

**SECOND AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

THIS SECOND AMENDED DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS AND INTEREST HOLDERS OF THE DEBTOR ENTITLED TO VOTE ON THE SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION SUBMITTED BY HELIA TEC RESOURCES, INC. HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO VOTE TO ACCEPT OR REJECT THE SECOND AMENDED PLAN. THIS SECOND AMENDED DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE CONCERNING THE SECOND AMENDED PLAN. ALL CREDITORS AND INTEREST HOLDERS ARE URGED TO READ THE ENTIRE SECOND AMENDED DISCLOSURE STATEMENT AND SECOND AMENDED PLAN WITH CARE.

ON <u>OCTOBER 1, 2014</u>, THE BANKRUPTCY COURT APPROVED THIS SECOND AMENDED DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE. SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE SECOND AMENDED PLAN HEREIN DESCRIBED IS BEING SOUGHT FROM CREDITORS AND INTEREST HOLDERS WHOSE CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR ARE IMPAIRED UNDER THE SECOND AMENDED PLAN. <u>CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE ON THE SECOND AMENDED PLAN ARE URGED TO VOTE IN FAVOR OF THE SECOND AMENDED PLAN</u> AND TO RETURN THE COMPLETED BALLOT INCLUDED WITH THIS SECOND AMENDED DISCLOSURE STATEMENT IN THE ACCOMPANYING ENVELOPE ADDRESSED TO FUQUA & ASSOCIATES, PC, ATTENTION: RICHARD L. FUQUA, 5005 RIVERWAY DRIVE, SUITE 250, HOUSTON, TEXAS 77056, <u>NOT LATER THAN NOVEMBER 17, 2014 at 5:00 P.M. (Houston time).</u>

**Fuqua & Associates, PC**
Richard L. Fuqua
5005 Riverway, Suite 250
Houston, Texas 77056
(713) 960-0277
(713) 960-1064 (facsimile)

**Richard A. Battaglia, P.C.**
Richard A. Battaglia
P.O. Box 131276
Houston, Texas 77219-1276
713.521.3570  Telephone
713.521.3573  Telecopier

**Counsel for the Debtor**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 INTRODUCTION ................................................................................................1

    1.1      GENERAL INFORMATION CONCERNING SECOND AMENDED DISCLOSURE STATEMENT AND SECOND AMENDED PLAN. .................................................................................................................... 1
    1.2      DISCLAIMERS. .......................................................................................................................2
    1.3      ANSWERS TO COMMONLY ASKED QUESTIONS. ........................................................................3

ARTICLE 2 OVERVIEW OF SECOND AMENDED PLAN .................................................7

ARTICLE 3 THE DEBTOR .................................................................................................9

    3.1      THE DEBTOR'S BUSINESS ........................................................................................................9

ARTICLE 4 CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE SECOND AMENDED PLAN ....23

    4.1      ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS. ..........................................................23
    4.2      CLASSIFIED CLAIMS AGAINST AND INTERESTS IN THE DEBTOR. ..............................................24

ARTICLE 5 IMPAIRMENT OF CLASSES AND RESOLUTION OF CLAIM CONTROVERSIES .............24

    5.1      IMPAIRED CLASSES. ..............................................................................................................24
    5.2      UNIMPAIRED CLASSES. ..........................................................................................................24
    5.3      CONTROVERSY CONCERNING CLASSIFICATION, IMPAIRMENT OR VOTING RIGHTS. ...................25

ARTICLE 6 TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS ........................................25

    6.1      TREATMENT OF IMPAIRED CLASSES. ......................................................................................25
    6.2      TREATMENT OF UNIMPAIRED CLASSES. ..................................................................................25

ARTICLE 7 MEANS OF IMPLEMENTATION ...................................................................26

    7.1      TRANSFER. ...........................................................................................................................26
    7.2      VESTING OF PROPERTY OF THE ESTATE IN THE LIQUIDATING DEBTOR. .....................................26
    7.3      CONTINUATION OF OPERATIONS. ............................................................................................26
    7.4      CONTINUED CORPORATE EXISTENCE. .....................................................................................27
    7.5      GENERAL POWERS OF THE PLAN AGENT. ................................................................................27
    7.6      OBLIGATIONS OF THE PLAN AGENT. .......................................................................................29
    7.7      LIMITATIONS ON THE POWERS OF THE PLAN AGENT. ...............................................................30
    7.8      RESIGNATION/ REMOVAL OF THE PLAN AGENT. ……………………………………………... 30
    7.9      APPOINTMENT OF SUCCESSOR PLAN AGENT. ...........................................................................30
    7.10    COMPENSATION PROCEDURES. ...............................................................................................30

ARTICLE 8 CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED CLAIMS/INTERESTS AND PROCEDURES FOR ASSERTING CLAIMS. ...............................................30

    8.1      OBJECTION PROCESS. ............................................................................................................30
    8.2      FILING OF CLAIMS AND CAUSES OF ACTION. ..........................................................................31
    8.3      DISPUTED CLAIMS RESERVE. .................................................................................................31
    8.4      DISTRIBUTIONS TO HOLDERS OF DISPUTED CLAIMS AND DISPUTED INTERESTS. .......................31
    8.5      DISALLOWANCE OF LATE FILED PROOFS OF CLAIM. ...............................................................31
    8.6      PROVISIONS GOVERNING DISTRIBUTIONS. ..............................................................................31

ARTICLE 9 EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........................................33

    9.1      REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ..........................................33
    9.2      ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ................................................33
    9.3      CLAIMS BASED ON REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES. ...............33
    9.4      RESERVATION OF RIGHTS. .....................................................................................................33

**ARTICLE 10 EFFECT OF CONFIRMATION** .................................................................................**34**

10.1 LEGALLY BINDING EFFECT. .................................................................................34
10.2 LIMITED PROTECTION OF CERTAIN PARTIES IN INTEREST. ..................................34
10.3 INDEMNIFICATION. ..............................................................................................34
10.4 PRESERVATION OF CLAIMS AND RIGHTS. ...........................................................35

**ARTICLE 11 CONFIRMATION OF THE SECOND AMENDED PLAN** .........................................**35**

11.1 CONFIRMATION HEARING. ...................................................................................35
11.2 STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE SECOND AMENDED PLAN. ...36
11.3 CRAMDOWN. ......................................................................................................38
11.4 CONDITIONS PRECEDENT TO EFFECTIVE DATE. ..................................................39
11.5 ANNULMENT OF PLAN IF CONDITIONS NOT WAIVED OR SATISFIED. ....................40
11.6 RETENTION OF JURISDICTION BY BANKRUPTCY COURT. ....................................40

**ARTICLE 12 COMPROMISES AND SETTLEMENTS** ............................................................**41**

12.1 EFFECT OF CONFIRMATION ORDER. ....................................................................41

**ARTICLE 13 MISCELLANEOUS PROVISIONS** ...................................................................**41**

13.1 BAR DATE FOR ADMINISTRATIVE CLAIMS. ........................................................42
13.2 OBJECTIONS TO ADMINISTRATIVE CLAIMS. .......................................................42
13.3 PAYMENT OF PROFESSIONAL CLAIMS. ...............................................................42
13.4 PAYMENT OF UNITED STATES TRUSTEE FEES. ...................................................42
13.5 DIRECTIVE TO STATE AGENCIES. .......................................................................41
13.6 SATISFACTION OF LIABILITIES. ..........................................................................41
13.7 WARRANTY OF TRANSFERS FROM LIQUIDATING DEBTOR. .................................41
13.8 COMPLIANCE WITH TAX REQUIREMENTS. ..........................................................43
13.9 AMENDMENT OF THE PLAN. ...............................................................................42
13.10 TIMING OF DISTRIBUTIONS. ................................................................................43
13.11 ENFORCEMENT OF SUBORDINATION AGREEMENTS/SETTLEMENT AGREEMENTS..43
13.12 FILING OF DOCUMENTS IN PUBLIC RECORDS. ...................................................43
13.13 RIGHT TO SEEK FURTHER ORDERS. ....................................................................43
13.14 REGULATORY APPROVALS. ................................................................................43
13.15 WITHDRAWAL OF PLAN. ....................................................................................44
13.16 DUE AUTHORIZATION BY CREDITORS. ...............................................................44
13.17 FILING OF ADDITIONAL DOCUMENTATION. ........................................................44
13.18 IMPLEMENTATION. .............................................................................................44
13.19 SUBSTANTIAL CONSUMMATION. ........................................................................44
13.20 FURTHER EFFECT OF CONFIRMATION. ...............................................................44
13.21 DATES. ..............................................................................................................44
13.22 GOVERNING LAW. ..............................................................................................45
13.23 CONFLICT. .........................................................................................................45
13.24 SEVERABILITY. ..................................................................................................45
13.25 SETOFFS. ...........................................................................................................45
13.26 OTHER CONSIDERATIONS. ..................................................................................45
13.27 FEASIBILITY OF THE PLAN. ................................................................................45
13.28 CONTINUATION OF THE CASE. ...........................................................................46
13.29 ALTERNATIVE PLANS OF LIQUIDATION. .............................................................46
13.30 LIQUIDATION UNDER CHAPTER 7. ......................................................................46
13.31 RISK FACTORS. ..................................................................................................46
13.32 TAXATION ..........................................................................................................47

**ARTICLE 14 CAUSES OF ACTION** ...................................................................................**50**

14.1 PREFERENCES. ...................................................................................................50
14.2 FRAUDULENT TRANSFERS. .................................................................................50
14.3 OTHER CAUSES OF ACTION. ...............................................................................50

**ARTICLE 15 VOTING PROCEDURES AND REQUIREMENTS** ...............................................**51**

15.1 BALLOTS AND VOTING DEADLINE. .....................................................................51
15.2 CREDITORS ENTITLED TO VOTE. ........................................................................51
15.3 VOTING PROCEDURES...........................................................................52

15.4    VOTE REQUIRED FOR CLASS ACCEPTANCE……………………………………………………52

15.5    CRAMDOWN AND WITHDRAWAL OF THE SECOND AMENDED
        PLAN……………………………………………………………………………………........52

# ARTICLE 1
# INTRODUCTION

## 1.1    General Information Concerning Second Amended Disclosure Statement and Second Amended Plan.

Helia Tec Resources, Inc. (the "Debtor") submits this Second Amended Disclosure Statement, as may be amended from time to time, under §1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to all of the Debtor's known Creditors and Interest Holders entitled to vote on the Debtor's Second Amended Chapter 11 Plan of Liquidation (the "Second Amended Plan"). The purpose of this Second Amended Disclosure Statement is to provide adequate information to enable Creditors and Interest Holders who are entitled to vote on the Second Amended Plan to arrive at a reasonably informed decision in exercising their respective right to vote on the Second Amended Plan.  A copy of the Second Amended Plan is included with this Second Amended Disclosure Statement. Capitalized terms used but not defined in this Second Amended Disclosure Statement shall have the meanings assigned to them in the Second Amended Plan or in the Bankruptcy Code and Bankruptcy Rules.  All section references in this Second Amended Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtor has proposed the Second Amended Plan consistent with the provisions of the Bankruptcy Code.  The purpose of the Second Amended Plan is to facilitate the sale of substantially all of the Debtor's operating assets to the highest bidder and then distribute those proceeds to Creditors and Interest Holders in accordance with the Bankruptcy Code.  Once the Second Amended Plan is completed, the Debtor will be dissolved.  The Debtor believes that the Second Amended Plan provides for the maximum recovery available for all Classes of Claims and Equity Interests.

This Second Amended Disclosure Statement is not intended to replace a careful review and analysis of the Second Amended Plan, including the specific treatment of Claims and Equity Interests under the Second Amended Plan.  It is submitted as an aid and supplement to your review of the Second Amended Plan and to explain the terms of the Second Amended Plan. Every effort has been made to fairly summarize the Second Amended Plan and to inform Creditors and Interest Holders how various aspects of the Second Amended Plan affect their respective positions.  If any questions arise, the Debtor urges you to contact either of the Debtor's counsels.  These attorneys will attempt to resolve your questions.  You are also encouraged to consult with your own counsel.  The counsels for Debtor are likewise available to answer any questions that your counsel may have regarding the Second Amended Plan and this Second Amended Disclosure Statement.

**1.2     Disclaimers.**

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS SECOND AMENDED DISCLOSURE STATEMENT AND § 1125 OF THE BANKRUPTCY CODE.   NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE SECOND AMENDED PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT.   CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTOR OTHER THAN THAT CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT, ANY ATTACHMENTS THERETO AND THE SECOND AMENDED PLAN.**

**EXCEPT AS SET FORTH IN THIS SECOND AMENDED DISCLOSURE STATEMENT, NO REPRESENTATION CONCERNING THE DEBTOR, ITS ASSETS, ITS LIABILITIES, PAST OR FUTURE OPERATIONS, OR CONCERNING THE SECOND AMENDED PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE SECOND AMENDED PLAN.   ANY REPRESENTATIONS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE SECOND AMENDED PLAN OTHER THAN AS CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTOR.**

**UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS SECOND AMENDED DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS SECOND AMENDED DISCLOSURE STATEMENT.   NEITHER DELIVERY OF THIS SECOND AMENDED DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE SECOND AMENDED DISCLOSURE STATEMENT AND THE SECOND AMENDED PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE SECOND AMENDED DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE SECOND AMENDED DISCLOSURE STATEMENT WERE COMPILED.**

**THE INFORMATION PROVIDED HEREIN WAS OBTAINED FROM A VARIETY OF SOURCES AND IS BELIEVED TO BE RELIABLE.   PROVIDED, HOWEVER, THE ASSERTIONS CONTAINED IN EXHIBIT "4" PROVIDED BY HSC HOLDINGS ARE NOT BELIEVED TO BE RELIABLE BY THE DEBTOR, ITS OFFICERS, OR THE DEBTOR'S ATTORNEYS.    RATHER, EXHIBIT "4" WAS PROVIDED BY HSC HOLDINGS AS A STATEMENT OF ITS POSITION REGARDING THE HISTORY HSC HOLDINGS WOULD HAVE CREDITORS AND THE BANKRUPTCY COURT BELIEVE. EXHIBIT "4" DOES CONTAIN THE POSITIONS VOICED BY HSC HOLDINGS TO THEIR POSITION AND WHY THEY BELIEVE THE FRAUD THEY PERPETRATED AGAINST THE DEBTOR AND ITS CREDITORS CANNOT BE UNDONE.   THE DEBTOR WAS INSTRUCTED BY THE BANKRUPTCY COURT TO ALLOW HSC HOLDINGS TO ASSERT THEIR POSITION IN OPPOSITION TO THE DEBTOR'S PLAN AND DISCLOSURE STATEMENT.   THAT IS THE SOLE REASON**

EXHIBIT "4" HAS BEEN INCLUDED IN THE DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT.

THE DEBTOR HAS NOT BEEN ABLE TO INDEPENDENTLY VERIFY EACH AND EVERY STATEMENT CONTAINED HEREIN.  ACCORDINGLY, THE DEBTOR AND ITS PROFESSIONALS CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE DEBTOR'S BUSINESS AFFAIRS ARE COMPLEX.  IT IS POSSIBLE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE SECOND AMENDED PLAN COULD HAVE NEGATIVE TAX AND OTHER ECONOMIC CONSEQUENCES.  THE DEBTOR MAKES NO REPRESENTATIONS REGARDING THE TAX IMPLICATIONS OF ANY TRANSACTION CONTEMPLATED UNDER THE SECOND AMENDED PLAN.  IT IS NOT UNCOMMON FOR PARTIES TO RETAIN THEIR OWN TAX ADVISORS TO ANALYZE THE SECOND AMENDED PLAN.  THE DEBTOR ENCOURAGES ALL PERSONS THAT MIGHT BE AFFECTED TO SEEK INDEPENDENT ADVICE REGARDING THE TAX EFFECTS OF THE SECOND AMENDED PLAN.

DISTRIBUTION OF THIS SECOND AMENDED DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTOR OR ITS PROFESSIONALS THAT THE SECOND AMENDED PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE SECOND AMENDED PLAN WILL RESULT IN A RISK-FREE LIQUIDATION OF THE DEBTOR'S ASSETS OR THAT ALL POTENTIAL ADVERSE EVENTS HAVE BEEN ANTICIPATED.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS SECOND AMENDED DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE SECOND AMENDED PLAN OR A GUARANTY OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS SECOND AMENDED  DISCLOSURE STATEMENT AND THE SECOND AMENDED  PLAN SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE SECOND AMENDED PLAN.  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THE TERMS OF THE SECOND AMENDED PLAN ARE SUMMARIZED IN THIS SECOND AMENDED DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE SECOND AMENDED PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.

## 1.3    Answers to Commonly Asked Questions.

As part of the Debtor's efforts to inform Creditors and Interest Holders regarding the Second Amended Plan and the Second Amended Plan confirmation process, the following

summary provides answers to questions which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE SECOND AMENDED PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

### 1.3.1   Who is the Debtor?

The Debtor is Helia Tec Resources, Inc., a Texas corporation.  The Debtor's business was founded in 2007 and established in Houston, Texas. The Debtor's operations have incurred debt with respect to the Debtor's current business model, inclusive of general corporate business, international oil & gas business, current and past litigation, and its previous operation of certain Texas oil and gas properties and interests.

The Debtor's business model currently consists of a participation (a "1.2% IPI Percentage") in the $125,000,000 Amended and Restated Indirect Participation Interest Agreement (the "IPI Agreement") dated February 25, 2005, which was entered into by and between InterOil Corporation ("IOC"), a Yukon Territories (Canada) corporation whose common shares trade on the New York Stock Exchange ("NYSE"), and the Investors regarding the development of potential oil or gas reserves physically located in Papua New Guinea (the "PNG Project").   Approximately 25% of IOC's working interest (8/8ths basis) in the PNG Project was assigned on an indirect participating basis ("IPI Percentage" basis) under the terms of the IPI Agreement to Investors.  All IPI Percentages are convertible to free trading shares of IOC common stock by the terms of the IPI Agreement and its associated Registration Rights Agreement.   On 30 March 2009 IOC publicly announced the results of its preliminary exploration revealing a low, middle, and high estimate of contingent resources net to IOC's interest (then approx. 70%) as of 31 December 2008 of 235.7 million barrels of oil equivalent (hereinafter referred to as "MMBOE"), 351.2 MMBOE, and 487.8 MMBOE respectively.  On 26 March 2014 IOC publicly announced the purchase of 1.0536% IPI Percentage for $41.53MM in IOC common shares.  Oil Search Limited announced on 27 February 2014 (closed 13 March 2014) that it had purchased all the shares of Pacific LNG Operations Ltd., itself a then purported owner of up to a 22.835% participating interest in the PNG Project for $900,000,000.  The assets underlying the March 2009 announcement and these recent transactions are directly attributable to the investment and expenditures underlying the IPI Agreement.

The Debtor's business model also includes a remaining balance of $7,000,000 in the Project Investment Agreement (the "PIA") which was a milestone agreement requiring the Debtor to provide an initial $15,000,000 deposit (the "PIA Deposit") to Pacific LNG Operations Ltd. ("PLNG").  Subject to further negotiation and conditions precedent in line with the PIA milestones, the Debtor had the ability to enter into several transactions outlined in the PIA, one of them being an investment in the IPI Agreement.

In June 2007, after completing further negotiations on terms, PLNG  assigned its previously acquired 1.2% IPI Percentage (the "1.2% IPI Percentage" or the "IPI Percentage") in the IPI Agreement to the Debtor in exchange for a deduction of $8,000,000 from the previously wired funds on deposit with PLNG under the terms of the PIA.  The remaining deposit with PLNG at that time was $7,000,000.

### 1.3.2    What is a Chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a controlled fashion.  The Debtor is proposing to liquidate all of its assets.  The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed.  During a Chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the Court orders the appointment of a trustee.

### 1.3.3    If the Second Amended Plan governs how my Claim or Interest is treated, what is the purpose of this Second Amended Disclosure Statement?

The Bankruptcy Code requires that in order to solicit votes on a bankruptcy plan, the proponent of the plan must first prepare a disclosure statement that provides sufficient information to allow creditors and interest holders to make an informed decision about the Second Amended Plan.  The disclosure statement and plan are distributed to creditors and interest holders only after the Bankruptcy Court has approved the disclosure statement and determined that the disclosure statement contains information adequate to allow creditors and interest holders to make an informed judgment about the plan.  At that time, creditors and interest holders whose claims and interests are impaired under the Second Amended Plan also receive a voting ballot and other materials.

### 1.3.4    Has this Second Amended Disclosure Statement been approved by the Bankruptcy Court?

Yes.   On October 1, 2014, the Bankruptcy Court approved this Second  Amended Disclosure Statement as containing adequate information.   "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable considering the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a hypothetical investor typical of holders of claims or interests of the relevant classes to make an informed judgment whether to vote to accept or reject the Second Amended Plan.   The Bankruptcy Court's approval of this Second Amended Disclosure Statement does not constitute an endorsement of any of the representations contained in either the Second Amended Disclosure Statement or the Second Amended Plan.

### 1.3.5    How do I determine how my Claim or Interest is classified?

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest. Under the Second Amended Plan, Claims and Interests are classified into a series of classes.  The pertinent articles and sections of the Second Amended Disclosure Statement and Second Amended Plan disclose, among other things, the treatment that each class of Claims or Interests will receive if the Second Amended Plan is confirmed.

### 1.3.6    Why is confirmation of the Second Amended Plan important?

The Bankruptcy Court's confirmation of the Second Amended Plan is a condition to the Debtor carrying out the treatment of Creditors and Interest Holders under the Second Amended Plan.  Unless the Second Amended Plan is confirmed, and any other conditions to confirmation

or to the effectiveness of the Second Amended Plan are satisfied, the Debtor is legally prohibited from satisfying Claims or Interests as provided in the Second Amended Plan.  <u>Put more simply, confirmation of a plan in Chapter 11 is required before the Debtor can begin making payments to pre-petition Creditors.</u>

### 1.3.7    What is necessary to confirm the Second Amended Plan?

Under applicable provisions of the Bankruptcy Code, confirmation of the Second Amended Plan requires that, among other things, at least one class of impaired Claims or Interests vote to accept the Second Amended Plan.  Acceptance by a class of claims or interests means that at least two-thirds in the total dollar amount and more than one-half in number of the allowed Claims or Interests actually voting in the class vote in favor of the Second Amended Plan.  Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests.  Besides acceptance of the Second Amended Plan by a class of impaired creditors or interests, a bankruptcy court also must find that the Second Amended Plan meets a number of statutory tests before it may confirm the Second Amended Plan.  These requirements and statutory tests generally are designed to protect the interests of holders of impaired claims or interests who do not vote to accept the Second Amended Plan but who will nonetheless be bound by the Second Amended Plan's provisions if the bankruptcy court confirms the Second Amended Plan.

If one or more classes vote to reject the Second Amended Plan, the Debtor may still request that the Bankruptcy Court confirm the Second Amended Plan under § 1129(b) of the Bankruptcy Code.  To confirm a plan not accepted by all classes, the plan proponent must demonstrate that the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan. This method of confirming a plan is commonly called a "cramdown."  In addition to the statutory requirements imposed by the Bankruptcy Code, the plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

### 1.3.8    Is there a Committee in this case?

No.  The Office of the United States Trustee has not appointed an official committee of unsecured creditors in this case.   The Official Committee of Unsecured Creditors would represent the interests of all unsecured creditors in this Chapter 11 Case.

### 1.3.9    When is the deadline for returning my ballot?

The Bankruptcy Court has directed that, to be counted for voting purposes, your ballot must be received by the Debtor's counsel by **November 17, 2014 at 5:00 p.m.  (Houston Time)**.

**IT IS IMPORTANT THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE ON THE SECOND AMENDED PLAN.  THE DEBTOR BELIEVES THAT THE SECOND AMENDED PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS AND INTEREST HOLDERS.  THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE SECOND AMENDED PLAN IS IN THE BEST**

INTEREST OF CREDITORS AND INTEREST HOLDERS AND RECOMMENDS THAT
ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE TO ACCEPT THE
SECOND AMENDED PLAN.

## ARTICLE 2
## OVERVIEW OF SECOND AMENDED PLAN

An overview of the Second Amended Plan is set forth below.  This overview is qualified
in its entirety by reference to the Second Amended Plan.  If the Bankruptcy Court confirms the
Second Amended Plan and, in the absence of any applicable stay, all other conditions set forth in
the Second Amended Plan are satisfied, the Second Amended Plan will take effect on the
Effective Date.

Under the Second Amended Plan, the Debtor will sell substantially all of its assets
(defined in the Second Amended Plan as the "Business").  The Debtor will seek authority to
transfer the Debtor's 1.2% IPI Percentage, $7MM PIA Deposit, and all other assets to the
Liquidating Debtor.  Then, pursuant to the terms of the IPI Agreement the 1.2% IPI Percentage
the Plan Agent shall then seek to either sell, liquidate, or convert the 1.2% IPI Percentage to
cash, in such manner as is deemed appropriate by the Plan Agent.   The Plan Agent[1]  will
institute collection procedures regarding the remaining PIA Deposit and reduce that asset to cash.
The remaining assets will be marshalled and liquidated to generate funds for distribution
pursuant to the confirmed Second Amended Plan.  Except for specifically identified assumed
liabilities and permitted liens, the Debtor's assets will be conveyed free and clear of all liens,
claims, interests and encumbrances under 11 U.S.C. §§ 1129(b)(2)(A)(iii) and 1123(a)(5).

Under the Second Amended Plan, the Plan Agent will use the proceeds generated from
liquidation of the Debtor's assets to satisfy Allowed Claims and Interests in accordance with the
Bankruptcy Code.  The treatment of specific classes of claims is set forth below.  You are
encouraged to pay special attention to the treatment provided to the class containing your claim.
In addition, the Plan Agent will be vested with authority to (i) take such actions necessary to
liquidate the Liquidating Debtor' assets; (ii) file claim objections; (iii) make distributions and
take such other actions as provided for under the Second Amended Plan; and (iv) prosecute
causes of action owned by the Debtor's estate, including all claims and causes of action arising
under the Bankruptcy Code.  Once all distributions have been made, the Plan Agent will file a
final tax return and dissolve the Liquidating Debtor.

The Debtor estimates that any sales funds will be distributed as follows:

---

[1]  The Debtor has proposed that Heather René Potts serve as the initial Plan Agent under the Second Amended Plan.
Her Curriculum Vitae is attached to this Disclosure Statement as Exhibit "3."

|  | Estimated recovery under proposed **Second Amended Chapter 11 Plan** |
|---|---|
| **Cash Value of the Converted Stock, plus Assumed Liabilities** | $8,800,000[2] |
| **Pacific LNG Operations, Ltd Project Investment Agreement Deposit** | $7,000,000 |
| **Other assets** | **Unknown** |
| **Estimated Proceeds Available for Distribution** | **$15,800,000** |

|  | Estimated Claims if Allowed |
|---|---|
| **Total Estimated Assets Available for Distribution** | $15,800,000 |
| Less Secured Claims: |  |
|    Attorney Contingency Fee    (35%) | $5,530,000.00 |
|    Secured Claims | $1,981,174.06 |
| **Total Secured Claims** | **$7,511,174.06** |
| Less Chapter 11 Administrative and Priority Claims: [3] |  |
|    Allowed Administrative Expense Claim | $400,000.00 |
|    A Plan Agent Contingency Fee  (7.5%) | $1,185,000.00 |
|    Current Trade Payables | 0.00 |
|    Priority tax claims | $196,188.72 |
|    Chapter 11 professional fees | $500,000.00 |
| **Total Administrative and Priority Claims** | **$2,281,188.72** |

**Total Estimated Liquidation Proceeds Available to**

---

[2]  The 160,000 IOC common shares as a result of the exercise of the conversion option will generate, at the current IOC market price of approx. $55, potential cash value of  $8,800,000; further, this assumes that the Debtor's remaining PIA deposit (as defined herein) will total at least $5,500,000 at Closing.  There is some risk that such amount will not total $5,500,000, in which case the cash available will be adjusted.

[3]  The Debtor estimates that Administrative and Priority Claims.

| Unsecured Claims: | $6,007,637.22 |
|---|---|

**Estimated Distribution to Unsecureds**                                    **100%**

### ARTICLE 3
### THE DEBTOR

**3.1     The Debtor's Business and Capital Structure.**

**3.1.1    The Debtor's Pre-Petition Business.**

The Debtor is Helia Tec Resources, Inc. (the "Debtor" or "HTR"), a Texas corporation. The Debtor's business was founded in 2007 and established in Houston, Texas. The Debtor's operations have incurred debt with respect to the Debtor's current business model, inclusive of general corporate business, international oil & gas business, current and past litigation, and its previous operation of certain Texas oil and gas properties and interests.

The Debtor's business model currently consists of a participation (a "1.2% IPI Percentage") in the $125,000,000 Amended and Restated Indirect Participation Interest Agreement (the "IPI Agreement") dated February 25, 2005, which was entered into by and between InterOil Corporation ("IOC"), a Yukon Territories (Canada) corporation whose common shares trade on the New York Stock Exchange ("NYSE"), and the Investors regarding the development of potential oil or gas reserves physically located in Papua New Guinea (the "PNG Project"). Approximately 25% of IOC's working interest (8/8ths basis) in the PNG Project was assigned on an indirect participating basis ("IPI Percentage" basis, i.e. as an asset or security, but not as real property) under the terms of the IPI Agreement to Investors. All IPI Percentages are convertible to free trading shares of IOC common stock by the terms of the IPI Agreement and its associated Registration Rights Agreement. On 30 March 2009 IOC publicly announced the results of its preliminary exploration revealing a low, middle, and high estimate of contingent resources net to IOC's interest (then approx. 70%) as of 31 December 2008 of 235.7 million barrels of oil equivalent (hereinafter referred to as "MMBOE"), 351.2 MMBOE, and 487.8 MMBOE respectively. On 26 March 2014 IOC publicly announced the purchase of 1.0536% IPI Percentage for $41.53MM in IOC common shares. Oil Search Limited announced on 27 February 2014 (closed 13 March 2014) that it had purchased all the shares of Pacific LNG Operations Ltd., itself a then purported owner of up to a 22.835% participating interest in the PNG Project for $900,000,000. The assets underlying the March 2009 announcement and these recent transactions are directly attributable to the investment and expenditures underlying the IPI Agreement.

The Debtor's business model also includes a remaining balance of $7,000,000 in the Project Investment Agreement (the "PIA") which was a milestone agreement requiring the Debtor to provide an initial $15,000,000 deposit (the "PIA Deposit") to Pacific LNG Operations Ltd. ("PLNG"), which was paid by HTR on 22 February 2007. Subject to further negotiation and conditions precedent in line with the PIA milestones, the Debtor had the ability to enter into several transactions outlined in the PIA, one of them being an investment in the IPI Agreement.

In June 2007, after completing further negotiations on terms, PLNG assigned its previously acquired 1.2% IPI Percentage (the "1.2% IPI Percentage" or the "IPI Percentage") in the IPI Agreement to the Debtor in exchange for a deduction of $8,000,000 from the previously wired funds on deposit with PLNG under the terms of the PIA. The remaining deposit with PLNG at that time was $7,000,000.

In addition to the 1.2% IPI Percentage and $7,000,000 PIA Deposit, HTR also purchased, invested in, and managed directly certain interests in Texas based oil and gas properties.

In 2009, HTR's financial condition was so severe that HTR sought to convert some portion of the 1.2% IPI Percentage into IOC stock pursuant to the IPI Agreement.  In March 2009 HTR's management was informed that an HTR Korean shareholder, GE&F Co., Ltd. n/k/a HSC Holdings Co., Ltd. ("GE&F" or "HSC") was alleged to have transferred the HTR 1.2% IPI Percentage and $7,000,000 PIA Deposit to PLNG and Clarion Finanz AG for the sum of $8,000,000. On 7 May 2009 HTR received actual confirmation of certain transaction documents allegedly purporting such a transfer.   The alleged transfer was not authorized by HTR's management or its Board of Directors and immediately created a cloud on title to the 1.2% IPI Percentage and PIA Deposit.

IOC, the promoter, sponsor, and transfer agent of the IPI Agreement refused and continues to refuse to recognize HTR's lawful right to the 1.2% IPI Percentage claiming the possibility of multiple liability as a result of the alleged conduct of the Korean shareholder.  IOC, PLNG, and Clarion are partners in the various aspects of PNG Project.

Korean Equity Interests Fraud

In 2007 Hughes as Director of Helia Tec Co., Ltd**.** ("HTC" now known as GE&F Co., Ltd. and/or HSC Holdings Co., Ltd.), was authorized to form HTR, to be HTR's sole Director and President, and to conduct all affairs of HTR, among other  authorities.  On January 2007 HTR was, in fact, formed, duly organized, and authorized to conduct business pursuant to the laws of the State of Texas.  Hughes served as HTR's President and sole Director throughout 2007.  Hughes also served as CEO of HTC during 2007.  During the 2007 calendar year both HTC and HTR resolved to grant the directors and officers of HTR significant latitude to insure that HTR could attract, secure, and incentivize the service of qualified individuals to conduct HTR's business.  Hughes was, has been, and remains HTR's President and sole Director to this day.

On  December 7, 2007 another Korean publicly traded company, Innet Co. Ltd. ("Innet"), purchased an 11% stock position  in HTC.  On January 15, 2008, after a special meeting of the shareholders of HTC, the company was renamed GE&F Co., Ltd. ("GE&F") and added new principals namely Kwak Bong Seo ("Kwak"), Lee In Seop ("Lee"), and Cho Young Man ("Cho").  Kwak, Lee, and Cho were principals involved with GE&F only following the Innet purchase. In 2008 Kwak, Lee, and Cho, among others conspired to embezzle and misappropriate the $15MM previously raised by HTC and dedicated to its interest in HTR.  Despite being re-elected a Director on the Board of Directors of GE&F and CEO of GE&F by its Board of Directors on January 15, 2008, immediate discord between Hughes and Kwak, Lee, and Cho occurred as it became readily apparent to Hughes that these three and others were committed to stripping both GE&F and HTR of its revenues and assets and reduce them to their or Innet's sole control (despite Innet owning only 11% of GE&F).  In 2008 GE&F started conflicts with HTR regarding capital contributions and attempted to disrupt relations with Clarion and PLNG.  PLNG refused to cooperate with Kwak, Lee, and Cho.  In furtherance of their attempts GE&F's Kwak, Lee, and Cho sought to manufacture an HTR control controversy solely in the Texas/U.S.A. jurisdiction, but not in Korea where Hughes was a GE&F Director and publicly designated as control party for GE&F's oil & gas business, in order to have Hughes removed as HTR's sole Director and President.

In July 2008 Kwak, Lee, and Cho, allegedly as GE&F, instituted state court litigation in Houston, Texas to have Hughes removed as President and sole Director.  Hughes contested both

the procedure and Kwak, Lee, Cho and/or GE&F's authority to remove him as sole Director and President, especially in light of his positions and publicly announced responsibilities on the Board of GE&F itself.  In August 2008, GE&F called a special meeting of HTR shareholders; however, GE&F voided the special meeting request with no action ever having been taken. Another meeting was scheduled; in attendance at that meeting were Hughes, Timothy R. Gallagher ("Gallagher") HTR's then Director of Finance, HTR's attorney, Cho and his attorney and a Korean national M.S. Yoon ("Yoon") in addition to a Korean Interpreter.  Cho does not read, write, or speak English and neither does Kwak or Lee.

The Special Meeting notice was rescinded, though the parties met in an extended informal Annual Meeting of HTR shareholders in August 2008 to discuss alternatives to assisting HTR in its capital situation and to convert the $7MM PIA Deposit to an additional 1.0% IPI Percentage.  The parties reached a tentative accord wherein GE&F agreed to provide an immediate $300K Emergency loan to HTR in order to pay its creditors.  Hughes remained as President and sole Director having never been removed. The Korean originated state court litigation was dismissed.

GE&F never made the $300K capital infusion.  The absence of the $300K infusion exacerbated HTR's struggling financial condition.  Since HTR owned at that point the 1.2% IPI Percentage it became apparent to Hughes that the asset was at risk from state court remedies of HTR's trade creditors.  In September 2008, Hughes, Yoon, Carlo Civelli ("Civelli"), President of PLNG and Clarion, and others met in Singapore to (i) introduce parties; and, (ii) discuss conversion of the $7,000,000 PIA Deposit to a 1.0% IPI Percentage, as well as to protect HTR's assets and retire the then existing trade creditors.  Civelli deferred making any firm commitments on crediting the $7,000,000 PIA Deposit, however, he did make a tentative commitment to refund the $7,000,000 on a formula based upon future liquidity events.

In late 2008 and early 2009, GE&F and HTR conducted audits of the financials for their respective entities.  GE&F was requested by its auditors, Charm Accounting Corporation ("Charm") to verify that HTR did, in fact, control the 1.2% IPI Percentage and the remaining $7,000,000 PIA Deposit given that as at end fiscal year 2008 and beginning 2009, GE&F's HTR interest was its main remaining non-cash corporate asset.  Over 2008, despite having raised in excess of $13MM on Korean public markets, GE&F had both sold or "lost control of" all other subsidiaries and made a series of questionable overseas investments in Mongolia and elsewhere, which left it at the beginning of 2009 with approximately $7MM is cash and its investment in HTR (over $16MM).  HTR and GE&F so confirmed these aspects via confirmations received from IOC and PLNG.  Clarion and PLNG signed off that the PIA Deposit did, in fact, exist and both the Korean and domestic HTR audit firms were preparing to finalize their reports with a March 17, 2009 end date.  Charm requested and received verification of HTR's control over the 1.2% IPI Percentage from both GE&F and HTR.  GE&F's confirmation was dated February 13, 2009.

Also in late 2008, HTR's trade vendors were also not receiving funds and in material instances ceased doing any further business on the Texas based oil properties HTR had purchased.  Some vendors had initiated state court suits to collect their monies.  In order to salvage the HTR properties Hughes and Gallagher formed the Mastodon Group of companies. One entity, Mastodon Operating Company, LLC ("MOC")  secured a new P-5 license to operate and in October 2008 the operational control of certain of HTR's Texas oil and gas properties was transferred to MOC's P-5 with agreements from the creditors that services would continue to be rendered, provided MOC kept the accounts current (further discussed below).

In January 2009 Kwak, Lee, and Cho surreptitiously with intent to damage and defraud both GE&F and HTR illegally and without HTR authority sought to execute documents under

their respective signatures that (i) asserted their alleged control over HTR to Hughes' exclusion; and (ii) sought to transfer HTR's assets to themselves through a fictitious transfer not to Texas but to Korea. Kwak, Lee, and Cho and others clouded title to HTR's 1.2% IPI Percentage and the $7,000,000 PIA Deposit alleging sale of both assets back to PLNG for total consideration of only $8MM. The 1.2% IPI Percentage Interest provided a conversion option which HTR carried as a $9.2MM value (historical actual cash cost basis) on its books and records.

On February 18, 2009 totally unbeknownst to HTR, Hughes, Gallagher, the shareholders of GE&F or the Korean regulatory authorities, Kwak, Lee, and Cho purported to convey to PLNG for the sum of $8MM both the $7,000,000 PIA Deposit and the $9.2MM 1.2% Percentage. Thus, PLNG's out of pocket net cost for both assets was $1MM. Neither Kwak, Lee or Cho made this disclosure public nor informed either the Korean or HTR accountants. In fact, GE&F wholly failed to list the alleged transfer until its 2009 second or third quarter financial reports. PLNG paid an initial sum of approximately $1MM dollars February to April 2009, with a structured remaining balance to be paid out over the remainder of 2009.

To further this fraud Kwak, Lee, and Cho caused to be generated documents reflecting that GE&F would sell all its owned shares of HTR back to HTR for $8MM and that in conjunction with an assignment of the right to receive the PLNG $8MM consideration GE&F would absolve the HTR loan and HTR would receive back all of GE&F's HTR shares. All of these purported actions occurred without Hughes' knowledge or authorization whatsoever. None of these purported, alleged transactions took place under U.S. jurisdiction.

Though expending time and money to operate and salvage HTR, Hughes and Gallagher were not getting paid their contractual salary. In furtherance of their greed in March 2009 Kwak, Lee, and Cho had Yoon place an ultimatum to Hughes and Gallagher which amounted to an extortion letter wherein any monies that HTR was to receive from GE&F, that GE&F or others would receive ten percent (10%). HTR's trade creditor accruing debt problem had not been addressed since the August 2008 meeting. Vendors were now filing lawsuits in order to collect monies owed by HTR. The only issue that saved Yoon from a federal criminal referral, though one was explored, was the fact that Yoon did not receive any funds because GE&F was not paying monies as promised.

In furtherance of their fraud with full intent and knowledge that from GE&F's perspective GE&F had allegedly tendered all its HTR stock back to HTR, Kwak, Lee, and Cho sought to enter into a contractual arrangement with HTR, Hughes and Gallagher to secure their removal from HTR's office and their resignation from HTR. Hughes and Gallagher were totally unaware of the alleged February 18, 2009 transfer.

A Settlement and Mutual Release was negotiated such that GE&F agreed to pay $507K on a defined timetable to retire HTR trade debt outlined in August 2008, provided the principal condition being that GE&F would pay to HTR no later than March 5, 2009 the first tranche sum of $200K. The sum certain on a date certain was material to HTR, Hughes, and Gallagher as a non-negotiable point because of GE&F's demonstrated history of reneging on promised payments of funds. The pay date was absolutely critical for HTR, Hughes, and Gallagher as GE&F had virtually defaulted on every other obligation to fund HTR any money. The March 5, 2009 payment never arrived. Hughes and Gallagher immediately informed GE&F's agent, Yoon that the settlement was void, and the failure to make the timely payment constituted a material breach.

As a direct result of the GE&F breach of the March 5, 2009 payment and in order to alleviate the financial bloodletting, in March 2009 Hughes met with InterOil Corporation's then Chairman and CEO Phil Mulacek ("Mulacek"). During that lunch with Mulacek Hughes suggested that HTR convert some of the 1.2% IPI Percentage for cash in order to pay off the

trade creditors, particularly those that had already instituted suit.  It was in this lunch that Hughes learned for the first time of the potential for an alleged February 18, 2009 transfer, but with no specifics or dates whatsoever.  Hughes informed Mulacek that he had not heard of, much less authorized, any such transfer.  Hughes then sought confirmation from Civelli and PLNG and it was Civelli that ultimately provided HTR on May 7, 2009 the alleged paperwork with details of the date and terms of the February 18, 2009 Assignment, which purportedly substantiated the alleged transfer.  At all times prior to May 7, 2009, Yoon insisted to HTR, Hughes and Gallagher that Kwak, Lee, and Cho had not conducted any sale whatsoever of the 1.2% IPI Percentage or PIA Deposit.

In March in Korea, the Korean securities regulatory agency KOSDAQ determined that GE&F's public shares should be stop-traded and a de-listing investigation commenced.  In April 2009, through Kwak, Lee, and Cho the KOSDAQ determined that GE&F was guilty of inflation of revenues, embezzlement, and misappropriation, and preliminarily de-listed GE&F from further public trading April 14, 2009.  Because of the Korean investigation and regulatory actions, GE&F immediately sought a new deal with Hughes and HTR to assist GE&F with its appeals.  GE&F agreed to fund another $200K in capital for stock.  Kwak resigned as a GE&F director and as GE&F's CEO on April 23, 2009 replaced by Cho.  The money was received by HTR on April 24, 2009 and as requested and agreed an additional 2,000 shares of HTR stock were issued to GE&F on May 1, 2009.  HTR, Hughes, and Gallagher provided some HTR financial reports and schedules to GE&F at GE&F's request.  When HTR had confirmation of the alleged transfer on May 7, 2009, HTR informed its auditors and the previously tendered audit opinion was immediately withdrawn due to the purported undisclosed subsequent material change.  HTR's auditors notified Charm of its withdrawal and the reasons why May 12, 2009.  On May 14, 2009, GE&F's appeal of the KOSDAQ de-listing decision was denied and a final de-listing order was issued.

Contemporaneous with the above, PLNG and Civelli were placed on immediate notice that the February 18, 2009 transfer was unauthorized and probably a fraud.  Hughes vehemently urged Civelli to tender the funds associated with the purported transaction into the Court's registry to avoid litigation.

In early May 2009, Hughes retained counsel to institute a lawsuit filed May 17, 2009 in the Southern District of Texas, Houston Division which sought declaratory relief to clear the title of HTR's assets.  PLNG and Clarions's participation in this fraud became apparent when in June 2009, under the terms of the payment schedule appended to the alleged February 18, 2009 transfer, and notwithstanding HTR's warnings and concerns over the legitimacy of that transfer, PLNG made the next scheduled payment of $500K to Korea rather than tender the monies into the Court's registry.  An amended complaint was filed including a damage claim against PLNG, adding a conspiracy to defraud count.

HTR through Hughes has demanded conversion of the 1.2% IPI Percentage to IOC stock both in 2009 and 2010; however, IOC has steadfastly claimed that it was unable to comply due to a potential cloud on title and/or various other claims related to dual liability.  In fact, IOC who is, or was a partner with PLNG in the Papua New Guinea project has claimed and prosecuted a defense based upon potential dual liability; however, it has allowed PLNG to market its assets without issue.

Since the inception of the Southern District Litigation through to this date GE&F, and PLNG through GE&F, has prosecuted numerous fallacious and unsubstantiated litigations to hinder, delay and defraud HTR and its creditors.  PLNG paid Kwak, Lee, and Cho the $8MM and GE&F and Kwak, Lee, and Cho have refused and continue to refuse to pay HTR's creditors including Hughes and Gallagher.  Rather these parties have spent considerable sums on lawyers

to do just the opposite and frustrate HTR's efforts through voluminous litigation and assertions of frivolous non-existent claims including, but not limited to, in the Dewitt County Lawsuit seeking and securing *ex parte* temporary restraining orders, with d*e minimus* bond to enjoin HTR's attempt to arbitrate all claims against HTR's title to their assets, and filing a shareholder derivative suit against Hughes, Gallagher and others.

Subsequent to the potential diminution of asset value discovered with the May 7, 2009 receipt of the purported February 18, 2009 transfer, which potentially created a cloud on title to the material assets of HTR, and with HTR then being saddled with over $300K of vendor, Government, employee and other liabilities, and pursuant to valid corporate authority granted in 2007, HTR swapped debt for equity with certain of HTR's creditors, in an effort to stave off further litigation and to secure continued support for HTR. The debt for equity swaps diluted GE&F's stock position. GE&F is no longer the majority shareholder of HTR.

PLNG has readily contributed to GE&F, Kwak, Lee, and Cho's continued efforts to hinder, delay or defraud HTR by providing legal support for GE&F counsel possibly financial support as well. PLNG's attorneys have been present and have consulted with GE&F's attorney at every hearing in the pending bankruptcy.

Kwak, Lee, and Cho have asserted conflicting factual contentions concerning their alleged claims of HTR control or stock positions though they have provided no competent authority for their alleged corporate actions.

As a direct result of the continuing fraud perpetrated by Kwak, Lee, and Cho, as recently as February 24, 2014, HTR has sought the involvement of the Ministry Of Justice, Republic Of Korea to insure that any proceeds or monies to be paid to the GE&F/Korean equity interest holders through the pending bankruptcy actually goes to the appropriate Korean or foreign individuals.

<u>The Texas State Court Law Suits.</u>

In late 2008 through the Fall 2009, HTR was involved in a number of vendor or employee related lawsuits.

(i)     Cause No. 2008-62324; *Ryan Services, Inc. v. Helia Tec Resources, Inc*.; In the 11th Judicial District Court of Harris County, Texas settled by Agreed Judgment and forbearance on October 20, 2009.

(ii)     Cause No. 10-DVC-178603; *Basic Energy Service, Inc. v. Helia Tec Resources, Inc.*; In the 434th Judicial District Court of Fort Bend County, Texas settled by Agreed Judgment December 13, 2011.

(iii)     Cause No. 2009-05014; *Robert R. Crow v. Helia Tec Resources, Inc*.; In the 80th Judicial District Court of Harris County, Texas settled by Agreement.

(iv)     Cause No. 934,638; *Wise Well Intervention Services, Inc. v. Helia Tec Resources, Inc.* In the County Court At Law #4 of Harris County, Texas settled by Agreed Judgment with forbearance.

(v)     Cause No. 974,015; *CenterPoint Energy Field Services, Inc. v. Helia Tec Resources, Inc., a/k/a and d/b/a Helia Tec Resources*; In the County Court At Law #4 of Harris County, Texas settled by Agreed Judgment with forbearance.

<u>The Southern District of Texas Litigation.</u>

On May 17, 2009 following confirmation of the alleged transfer HTR filed suit in Case No. 4:09-cv-1482; styled *Helia Tec Resources vs. GE&F Co. Ltd., Pacific LNG Operations Ltd.,*

*and Clarion Finanz AG*; In the United States District Court for the Sothern District of Texas Houston Division for fraud against GE&F and declaratory relief against PLNG and Clarion Finanz AG ("Clarion") and the InterOil Corporation ("IOC") (the "HTR Suit"). Following the institution of the HTR Suit efforts to secure PLNG and Clarion's position regarding the alleged transfer of the IPI Percentage and the payment of the PLNG and Clarion consideration into the Court's registry failed, the HTR Suit was amended on July 3, 2009 to assert all fraud, conspiracy to commit fraud, conversion claims against GE&F and PLNG and declaratory relief as against all the defendants, including IOC.

On September 9, 2009 GE&F filed its Third Party Complaint against Cary E. Hughes ("Hughes") and Timothy R. Gallagher ("Gallagher") seeking enforcement of an alleged March 5, Settlement Agreement between Hughes, Gallagher and HTR.

On June 3, 2009, Hughes and Gallagher filed a Complaint against GE&F in Case No. 09-cv-1699; styled *Cary E. Hughes and Timothy R. Gallagher vs. GE&F Co., Ltd.*; In the United States District Court for the Southern District of Texas, Houston Division (the Hughes/Gallagher Suit") alleging among other matters fraud and shareholder oppression.

On March 8, 2010 the Hughes/Gallagher Suit was consolidated into the HTR Suit.

PLNG and Clarion filed a motion to dismiss all claims against them for lack of *in personum* jurisdiction and said motion was granted on September 24, 2010 dismissing PLNG and Clarion for having insufficient contact with the forum sufficient to impose jurisdiction upon them.

In January 2011, the Court allowed GE&F's then counsel, against the objections of HTR counsel, to withdraw from representing GE&F for lack of payment on their account and for their lack of responsiveness to attempted communications over the preceding six (6) months. GE&F went without legal representation in Federal Court until April 29, 2009. In the interim GE&F was sanctioned for non-responsiveness to requests for production and other matters.

On February 22, 2011 HTR filed a comprehensive motion for summary judgment against GE&F and IOC. IOC timely responded with a motion to dismiss for failure to have necessary parties which GE&F following the removal of sanctions against GE&F was allowed to submit a response and joined in the IOC motion to dismiss. On September 20, 2011 the Court denied without prejudice HTR's motion for summary judgment and agreeing with the IOC contention that all the necessary parties were not before the court the Court could not render the requested relief and dismissed HTR's claims without prejudice.

The Court's September 18, 2011 Order inadvertently dismissed the claims which comprised the Hughes/Gallagher Suit and GE&F's Third-Party Claim. A motion to re-instate those was filed and on September 20, 2012 ultimately granted the requested relief.

The Hughes/Gallagher Suit continued and was set for trial on February 18, 2014 until the filing of this bankruptcy on October 3, 2013 and is now subject to the 11 U.S.C. §362 automatic stay pending resolution of claims belonging to the HTR estate.

The Dewitt County Lawsuit.

Since the Hughes/Gallagher Suit was temporarily dismissed and not reflected as an active case, on October 27, 2011 GE&F instituted a state court law suit Cause No. 11-10-22,12; *HSC Holdings formerly known as GE&F Co., Ltd., Individually and Derivatively as Shareholder of Helia Tec Resources, Inc. v. Cary E. Hughes, Timothy R. Gallagher, Robert Crow, Noemi Licarte, Mastodon Operating Company, LLC, Mastodon Resources, LLC, Sendex Energy, LLC and Helia Tec Resources, Inc.*; In the 135th Judicial District Court of Dewitt County, Texas (the

"Dewitt Suit") alleging various causes of action including but not limited to misappropriation, fraud, conspiracy to defraud.

In an effort to thwart the then pending arbitration hearing schedule for February 13, 2012, GE&F secured an *ex parte* temporary restraining order in the Dewitt Suit. The Dewitt Suit does not make any claim as to the alleged February 18, 2009 transfer of HTR's IPI Percentage; however, GE&F used the suit as a basis to enjoin and frustrate HTR's efforts to resolve any alleged claims against the IPI Percentage.

The absence of basis to complain of the alleged February 18, 2009 transfer HTR removed the Dewitt Suit to the Southern District of Texas, Houston Division, Case No. 12-cv-00496. A hearing was conducted before the Honorable Lee Rosenthal on the expiration of the Dewitt Suit *ex parte* temporary restraining order and the Court suggested and the parties agreed to a temporary restraining order until motion to transfer venue and motion to remand could be filed and prosecuted.

The Court granted GE&F motion to transfer venue and the case was reassigned to Southern District of Texas, Victoria Division (the "Victoria Division Case").

The Korean Case.

In an effort to circumvent U.S. jurisdiction, cause significant additional expense, and in furtherance of the fraud PLNG sought to have a Korean Court declare the validity of the February 18, 2009 transfer.

On or about September 2, 2011 PLNG instituted suit in the South Central District Court 1701-1 Seoch-dong, Seocho-goo Seoul, Republic of Korea, Case No. 2011*GaDan* 289336; styled *Pacific L&G Operations Ltd. v. HSC Holdings., Ltd. (formerly known as GE&F Co., Ltd.), Helia Tec Resource, Inc. and Cary E. Hughes* seeking to establish under Korean law the validity and authenticity of the February 19, 2009 Assignment Agreement concerning the "validity and authenticity" of the alleged assignment and alleged transfer of HTR's right and interest in the HTR 1.2% IPI Percentage (the "Korean Case").

Hughes and HTR secured Korean counsel and filed pleas to the jurisdiction of the Korean court. GE&F made an appearance in the suit. Though with GE&F present, PLNG did not assert any affirmative claims for damages or misrepresentations against GE&F. GE&F filed no affirmative pleading and did not participate at all in the litigation save and except to agree to a dismissal. Following numerous continuances in favor of PLNG, PLNG could not meet its burdens and the Case was dismissed on motion of PLNG on or about June 2012.

The Victoria Division Suit.

Upon transfer of venue the removed Dewitt Suit was assigned Case No. 12-cv-00018 (the "Victoria Division Suit") GE&F moved to remand the case. HTR filed a motion to compel arbitration of any alleged claims against the HTR IPI Percentage since GE&F had used the Dewitt Suit jurisdiction to enjoin the arbitration from proceeding.

HTR argued that GE&F alleged "sale" of the HTR IPI Working interest required GE&F to be bound by the IPI Agreement which included the arbitration provisions. Further HTR asserted that the GE&F claims relate to the IPI Percentage . On September 18, 2012, the Court ruled that though the IPI Agreement did contain an arbitration provision, that none of the other parties involved were signatories to that agreement and that the "related to" test of the Fifth Circuit was too tenuous to support the imposition of arbitration. The Court further noted that the Dewitt Suit was more akin to management control of HTR.

Fortuitously on September 20, 2012 the District Court re-instated the Hughes/Gallagher Suit which obviated the continuation of the Dewitt Suit where it was abated soon thereafter.

The AAA Arbitration.

On January 12, 2012, HTR sought to secure a forum which could sustain jurisdiction over any and all parties that had any alleged claims against HTR's IPI Percentage.  Pursuant to the provision of the IPI Agreement HTR filed a claim to the American Arbitration Association ("AAA") the case was assigned AAA No. 50 198 T 0070 12 (the "AAA Case").

The AAA Case was subject to an *ex parte*  temporary restraining order with a *de minimus* bond pending resolution of the Victoria Case.  Following the denial of HTR's motion to compel HSC to arbitration field in the Victoria case the arbitration has been placed on hold pending this bankruptcy filing.

**AS DESCRIBED IN THE DISCLAIMERS SECTION OF PARAGRAPH 1.2 HEREOF, HSC HOLDINGS' EXPLANATION OF HSC'S CONDUCT AND HSC'S ANALYSIS OF THE DEBTOR'S ASSETS AND POSITION IS CONTAINED IN THE ATTACHED EXHBIT "4."**

### 3.1.2   Events Leading to Bankruptcy.

In its initial filings with the Court, the Debtor identified a number of factors that led to the bankruptcy filing.  First, in June 2009 the Debtor attempted to exercise the conversion rights pursuant to the IPI Agreement through IOC; however, IOC refused to recognize the Debtor as the sole owner of the IPI Percentage claiming that PLNG purported to have purchased the Debtor's IPI Percentage in February 2009 without any notice to the Debtor.   IOC has consistently refused the Debtor's demand to convert some, or all of the Debtor's IPI Percentage into IOC stock asserting that IOC would be subject to potential dual liability.  Since the IPI Percentage constitutes the overwhelming majority of the Debtor's value the Debtor instituted litigation to clear the Debtor's title.  Such efforts have been stymied by spurious litigation and absence of a single forum into which all parties would be subject to jurisdiction of the United States courts.

### 3.1.3   The Debtor's Assets.

On the Petition Date, the Debtor's most valuable assets consisted of (i) the 1.2% IPI Percentage; and (ii) the PIA Deposit.  There is also the potential of (iii) the Shareholder Derivative Claims to the extent those claims have any merit and/or whether potential recoveries merit pursuit of the claims.

On October 3, 2013, the Debtor filed with the Bankruptcy Court its Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, as amended, the "Schedules").  The Schedules contain a detailed listing of the Debtor's assets and the amounts owed to their Creditors based on the Debtor's books and records.   In connection with this Disclosure Statement, Creditors and Interest Holders are referred to the Schedules.  A copy of the Schedules is available from the Clerk's office or from the Debtor upon request.

Pursuant to the Second Amended Plan, all of the Debtor's assets will be transferred to a new entity which shall liquidate the assets and distribute any proceeds in accordance with the Second Amended Plan

<u>The Texas Properties (as related to the Shareholder Derivative Claims and potential recovery)</u>

In December 2006, HTR's then current parent Helia Tec Co., Ltd. ("HTC", subsequently known as GE&F Co., Ltd. and now known as HSC Holdings, Co., Ltd.) made a commitment to fund $3MM over the subsequent six (6) months to make various direct investments in oil and gas leases in the South Texas Coastal Plain (the "Texas Properties").

During 2007, HTC funded $1.25MM over eight (8) months. The following well prospects were acquired with results as notated during 2007:

| Well Name | Status When Acquired | Results |
|---|---|---|
| Hammermiller #1 | Shut-In, with surface facilities. | Worked-over and placed in production. |
| Grigar #A1 | Shut-In, no surface facilities. | Worked-over, placed in production with new Artificial Lift and Production facilities. |
| J. Respondek #1 | Shut-In, with minimal surface facilities. | Re-work of surface facilities, replaced and re-sized rental compressor, and placed in production. |
| Losack #1 | Shut-In, no surface facilities. | No funds to exploit. |
| Buckalew #1 | Shut-In, no surface facilities. | No funds to exploit. |
| Buckalew #2 | Shut-In, no surface facilities. | No funds to exploit. |
| R.A. Grigar #1 | Shut-In, no surface facilities. | No funds to exploit. |
| Bolinger #1 | Shut-In, minimal surface facilities. | Re-worked, tested with multiple different approaches, declared non-commercial due to high water production. |
| Atoka-Gohlke #1 | Shut-In, minimal surface facilities. | Re-worked surface, laid production line to new meter for sales, tested with multiple different approaches, declared non-commercial due to high |

| | | water production and not enough investment funds to complete exploitation. |
| --- | --- | --- |

During 2008, despite supportive commodity prices in the first half of the year ($147 per barrel peak in July 2008), by December 2008, dramatically lower commodity prices ($40 per barrel range in December) rendered the then producing Texas Properties unprofitable.

Following a February 2009 reserve report and assessments made by internal HTR management in agreement with HTR's auditor's, Weinstein & Spira, HTR wrote off all the assets of the Texas Properties due to the failure of the ceiling test as applied at December 31, 2008.

In October 2008, prior to the write-off and with oil prices already much reduced from earlier in the year (approximately $80 per barrel in October 2008), and following the failure of GE&F (HTC renamed GE&F Co., Ltd. in January 2008) to provide a $300,000 emergency loan agreed to in August 2008, HTR's Texas Properties were cut off by trade venders for failure to pay then outstanding charges.  Additionally, two (2) of the total three (3) producing properties were suffering from under investment in production facilities as a result of the previous failure to fund the originally agreed $3MM fund.  None of HTR's producing properties could be produced without water hauling, gauging, oilfield parts and supplies, mechanical, and/or rental equipment trade venders.  HTR management had decided to establish Mastodon Operating Company, L.L.C. ("MOC", a party related by common management to HTR) as the P-5 operator of the producing properties.  In doing so, MOC was able to convince trade creditors to re-establish trade relations for the Texas Properties now operated by MOC, allowing HTR's Texas Properties to continue in production.  Further, Mastodon Resources, L.L.C. ("MR", a party related by common management to HTR) to fund an up to $100,000 Velocity String Operation on the J. Respondek #1, in hopes that this well's problematic production cycle could be stabilized for continuous daily production at a higher level of total production.

In November 2008, the Texas Railroad Commission (the "TRRC") cited HTR for H-15 requirements on four InActive/Shut-In wells (Losack #1, R.A. Grigar #1, Buckalew #1, and Buckalew #2).  Failure to perform the H-15 tests or if the tests were conducted, but failed could have resulted in revocation of the plugging extension and six (6) month  plugging and abandonment orders by the TRRC.  A delay was requested until January 2009 and was granted.

In December 2008, MOC contracted and paid for a replacement prime mover (engine) for the pump operating Hydraulic Lift on the Grigar #A1 well, since the then current engine threw a rod.  By the very beginning of January 2009, oil production was re-established on the Grigar #A1, but at a reduced level.  Oil prices now hovered in the $40 per barrel range making all producing wells non-profitable, meaning operating expenses exceeded operating revenues.

In January 2009, MOC contracted and paid for H-15 tests on the four wells cited by the TRRC.  By January 31, 2009 MOC accumulated a total net expense for all operations for H-15's and on those HTR wells for which it held a P-4 (the Hammermiller #1 and the Grigar #A1) of $37,576.29 versus payments attributable from HTR's production from these wells of $25,924.90, totaling a net charge to HTR of $11,651.39.

By January 31, 2009 MR had expended a total of $74,077.49 for the Velocity String Operation and related projects and operations on the J. Respondek #1, versus payments attributable from HTR's portion of production from the well of $31,380.56, totaling a loss of $42,696.93 for MR.

In February 2009, HTR received notification that the previously conducted H-15 tests on the four wells cited by the TRRC had failed, and without a re-test, the four wells subject thereto would have their plugging extensions revoked and plugging required within six (6) months.  The Atoka-Gohlke #1 and the Bollinger #1 were now without leases (termination within primary term during 2008 due to non-commercial production after having been previously declared non-productive/non-commercial), but these wells had no then-current H-15 or other related regulatory burdens.  Nonetheless, all wells of HTR were transferred by P-4 to MOC's P-5 License, in order to avoid the necessity of HTR maintaining its P-5 and the related financial surety bond and State of Texas regulatory oversight.  HTR's regulatory and financial burdens were therefore materially reduced.  However, by month end HTR's total plugging and abandonment liability remained at $328,161.  As previously mentioned, during the audit of HTR's 2008 financials, all Texas Properties were written off as at December 31, 2008, providing for a net carrying asset value of $0.

In March 2009, all Texas Properties with leases and/or that had then-current problematic TRRC regulatory burdens (failed H-15's) potentially requiring immediate plugging and abandonment were transferred to Cary Hughes and Timothy Gallagher, and then subsequently transferred to MR in consideration for the assumption of approximately $231,661 in plugging and abandonment liability.  This transaction provided for a net gain to HTR of $231,661 in March 2009, reducing HTR's liabilities by a commensurate amount.

For the twelve (12) months ending December 31st for the years 2008 to 2013 , Mastodon Energy Partners, L.L.C. ("MEP") on a consolidated basis inclusive of MR and MOC has generated the following net losses and depletion losses from the Texas Properties assigned: ($17,287) and ($222,577), respectively (earnings, losses, and depletion as reported on forms 1120S and related K-1's).  Therefore, the total net loss for this time period is ($239,864).

For the twelve (12) months ending December 31st for the years 2008 to 2013, Mastodon Energy Partners, L.L.C. ("MEP") on a consolidated basis inclusive of MR and MOC has paid total compensation to its members, officers, and employees as follows: $389,132.85 (all forms of earnings reported on personal tax returns, which is a gross number and does not include reported earnings, losses, or depletion from K-1's related to ownership interests in Mastodon as shown above).

There were no material expenditures of MEP, MR, or MOC that were not directly attributable to the field operations of the Texas Properties assumed, or necessary for the maintenance of office or other Texas Properties related general and administration expenses.  Up to October 3, 2013 Mastodon Operating Company, L.L.C. had either paid directly or indirectly by cash advance to HTR, expenses of HTR totaling in excess of $146,796.94.

Production from the Texas Properties improved in late 2009 with the introduction of improved operating procedures and by the presence of at least one Mastodon principal on location every day, 365 days a year.  Oil prices improved steadily into 2011.  Oil production hit

its peak in late 2010 and early 2011.  However, in 2011 natural production declines began to take hold notwithstanding a generally supportive commodity price environment.  The necessity to fund HTR eliminated any opportunity for Mastodon to open or exploit any additional wells. Additionally, in November 2011 HSC filed a DeWitt County lawsuit and in February filed in Fort Bend and DeWitt county's land records a Lis Pendens, which placed a cloud on title to the Texas Properties effectively terminating Mastodon's ability to raise any third party finance whatsoever.  Also in 2011, Mastodon funded HTR's defense in a lawsuit filed by PLNG (served November 2011) in Korea against HTR caused the material depletion of what set aside internally generated funds Mastodon had achieved to that date.  With internal funds having been provided to HTR, and no ability to raise third-party financing of any kind, or to dispose of assets to raise funding, the Texas Properties have suffered production declines and normal late-life maintenance issues to the present time.  Currently, only the Hammermiller #1 is in production (approx. 2 barrels of oil per day).  The Grigar #A1 is awaiting go ahead on a work-over to fix a hole in tubing.  If brought back on line, the well may generate 3-5 barrels of oil and 80-90 barrels of water per day.  The Atoka-Gohlke #1 while previously approved for plugging extension in 2010, presently has a denial of plugging extension and a seal and rescind order.  Mastodon Operating Company, L.L.C.'s P-5 is up for renewal in August 2008, which will be disallowed unless either the TRRC will rectify what MOC believes to be a mistake on the TRRC's part or a new H-15 test on the Atoka-Gohlke #1 is conducted and passed.

As at the filing of the Second  Amended Plan, the Texas Properties were valued by Fort Bend and DeWitt County Tax Appraisers at approx. $52,386.02 total.   Current TRRC calculated plugging and abandonment liability under the terms of HB 2259 on the Mastodon assumed Texas Properties is $883,315.  HTR's own plugging and abandonment exposure on the Atoka-Gohlke #1 and Bollinger #1 now totals $194,288.

### 3.1.4  Debtor's Real and Personal Property Leases and Executory Contracts.

On the Petition Date, the Debtor was a party to a real property lease for office space which was subsequently rejected.  In addition the Debtor is also a party to an executory contract between the law firms of Richard A. Battaglia, P.C. and Dow Golub Remels & Beverly concerning the pre-petition attempts to clear title to HTR's assets.  This contract will be assumed.

### 3.1.5  Liabilities and Claims against the Debtor.

The Schedules contain a detailed listing of Creditors, together with the estimated amount of Claims.  Creditors and Interest Holders are referred to the Debtor's Schedules.  The Debtor's respective Schedules generally organize Creditors into three general groupings: (i) Schedule D-Secured Claims, (ii) Schedule E-Unsecured Priority Claims, (iii) Schedule F-Unsecured Nonpriority Claims; and (iv) Subordinated  Claims.  In addition, ten (10) claims have been filed. The last day to file a proof of claim was February 18, 2014.

### 3.1.6   Secured Claims.

The Debtor scheduled secured claims totaling $1,998,647.21.  A substantial portion of the secured claims will be disputed as to amount, whether a valid, unavoidable lien exists, or both. A number of creditors also filed secured proofs of claim.

### 3.1.7   Priority Claims.

The potential priority unsecured claims in the Debtor's case are the taxing authorities.

No determination has yet been made by the Debtor regarding the validity of any of the foregoing claims.

Certain creditors may also assert administrative expense claims that may be entitled to priority under 11 U.S.C. § 507.

### 3.1.8   General Unsecured Claims.

Based on the Claims Register, unsecured claims of approximately $143,616.68 have been filed against the Debtor.  This number may not include all tort claims, unliquidated claims or claims for rejection damages.  In addition, this number does not include any potential unsecured claims held by creditors filing secured claims that might be subject to avoidance and/or subordination.  The Debtor expects to file objections to a significant number of unsecured proofs of claims.  Should additional or amended proofs of claim be filed, the Debtor will review such claims and may file additional objections.  The Second  Amended Plan also provides a mechanism for other parties to object to claims under certain circumstances.  The Debtor is unable to predict the outcome of any anticipated claim objections that may be filed.

### 3.1.9   Subordinated Claims.

The principals of the Debtor namely, Cary E, Hughes, Timothy R. Gallagher, and the related entity controlled by these two individuals namely Mastodon Operating Company, LLC, will subordinate any payment of their claims until such point where all creditors through the General Unsecured Creditors are full and completely paid.

**THE RIGHT OF ALL PARTIES, INCLUDING THE DEBTOR, AND/OR THE PLAN AGENT (WHETHER EXISTING OR FORMED UNDER THE SECOND AMENDED PLAN) TO OBJECT TO ANY CLAIM FILED IN THIS CASE IS EXPRESSLY RESERVED.  THE INCLUSION OF A CLAIM OR CLAIMS WITHIN THIS SECOND  AMENDED DISCLOSURE STATEMENT IS NOT AN ADMISSION REGARDING THE VALIDITY OR ALLOWANCE OF ANY CLAIM.  YOU SHOULD NOT ASSUME THAT A VOTE FOR OR AGAINST THE SECOND  AMENDED PLAN WILL HAVE ANY AFFECT ON THE STATUS OF YOUR CLAIM.  IF ANYONE SUGGESTS THAT THE STATUS OF YOUR CLAIM MAY BE AFFECTED BY YOUR VOTE, YOU SHOULD REPORT SUCH INCIDENT TO COUNSEL FOR THE DEBTOR OR COUNSEL FOR THE COMMITTEE IMMEDIATELY AS ANY SUCH SUGGESTION MAY VIOLATE TITLE 18.**

### 3.1.10  Retention and Termination of Professionals.

On October 22, 2013, the Court approved the Debtor's motion to employ Richard L. Fuqua, II, Fuqua & Associates, PC ("Fuqua") as its bankruptcy counsel.  Fuqua was initially paid $12,500.00
On May 5, 2009 HTR retained the legal services of Richard A. Battaglia, P.C. on an hourly basis to defend various state court lawsuits then pending against HTR.
On or about May 14, 2009, HTR retained the service of Richard A. Battaglia, P.C. on a structured contingency basis starting at 25% recovery to prosecute and defend HTR's rights to the 1.2% IPI Percentage and the PIA Deposit.  A copy of the May 14, 2009 Engagement Agreement is attached to Exhibit 2 attached hereto. Subsequent litigation evolved herein it became necessary for the Richard A. Battaglia, P.C. to secure additional assistance to prosecute the HTR claims.  As a result on November 15, 2011 Richard A. Battaglia, P.C. and HTR reached a new agreement wherein the law firm of Dow, Golub, Remels & Beverly, P.C. would jointly handle legal matters.  The new engagement was made on a structured contingency basis for a larger starting contingency of 35%.   A true and correct copy of the November 15, 2011 Engagement Agreement is attached to Exhibit 2 and incorporated herein by reference.  The Debtor seeks to reaffirm the November 15, 2011 Engagement Agreement.
An Application to employ Richard A. Battaglia, P.C. and Dow, Golub, Remels & Beverly, P.C. will be filed and approval sought prior to confirmation.

### 3.1.11  Lease/Contract Rejection

The Debtor's lease with 1770 St. James Place, LP ("Landlord") terminated as a matter of law on or about January 31, 2014.  However, the Debtor has continued to occupy the premises.  Rent has been paid by Mastodon Operating Company, LLC ("Mastodon"), who is not a party to the lease with 1770 St. James Place, LP.   Mastodon intends to negotiate a new lease with the landlord prior to confirmation of the plan and retain possession of the premises and allow the Debtor to wind up its affairs.  Neither Mastodon nor the Landlord agreed to enter a new lease.  If a new lease cannot be negotiated with the Landlord prior to confirmation of the plan, the premises will be vacated no later than the 90th day of the month after the entry of the confirmation order. All rent will continue to be paid.


## ARTICLE 4
## CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE SECOND AMENDED PLAN

The Claims against and Interests in the Debtor are classified as set forth in this Article.

**4.1     Administrative Claims and Priority Tax Claims.**

In accordance with § 1123(a)(l) of the Bankruptcy Code, certain Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Second  Amended Plan.  These unclassified Claims are treated as follows.

**4.1.1   Administrative Claims.**     Allowed Administrative Claims arising under 11 U.S.C. § 503(b), including Cure Costs against the Debtor, will be paid in Cash and in full by the Plan Agent from the Sales Proceeds on the later of (i) the Administrative Claim Distribution Date, (ii) the date on which such Administrative Claim becomes an Allowed Claim; or (iii) such other date as the Plan Agent and the holder of the Allowed Administrative Claim shall agree.  Allowed Administrative Claims that are not secured by a valid, perfected, post-petition Lien are not entitled to post-petition interest or legal fees and expenses.

**4.1.2   Priority Tax Claims.**  Priority Tax Claims against the Debtor will be paid in Cash and in full by the Plan Agent from the Sales Proceeds on the later of (i) the Effective Date, (ii) the date on which such Priority Tax Claim becomes an Allowed Claim; or (iii) such other date as the Plan Agent and the holder of the Allowed Priority Tax Claim shall agree.  Allowed Priority Tax Claims that are fully Secured Claims shall be entitled to interest at the Plan Rate.

**4.2     Classified Claims Against and Interests in the Debtor**.

The Claims against and Interests in the Debtor are classified as follows:

**4.2.1   Class 1 – Priority Non-Tax Claims.**  Class 1 comprises all Allowed Priority Non-Tax Claims against the Debtor.

**4.2.2   Class 2 – Secured Claims.**  Class 2 comprises all Allowed Secured Claims.

**4.2.3   Class 3 – General Unsecured Claims**.  Class 3 comprises all Allowed General Unsecured Claims.

**4.2.4   Class 4 – Subordinated Claims.**  Class 4 comprises all Allowed Subordinated Claims.

**4.2.5   Class 5 – Equity Interests.**  Class 5 comprises all Allowed Equity Interests in the Debtor.

**4.3**     A schedule of all creditors and their respective claims including Proofs of Claims are attached hereto as Exhibit 1.

## ARTICLE 5
## IMPAIRMENT OF CLASSES AND RESOLUTION OF CLAIM CONTROVERSIES

**5.1     Impaired Classes.**

Only holders of Claims that are in impaired Classes may vote on the Second Amended Plan.  The following Classes of Claims and Interests are impaired under the Second Amended Plan:

**5.1.1**     There are impaired Classes.

**5.2     Unimpaired Classes.**

Holders of Claims that are in unimpaired Classes are deemed to have accepted the proposed Second Amended Plan and are not entitled to vote on the Second Amended Plan.  The following Classes of Claims are not impaired under the Second Amended Plan:

**5.2.1**     Class 1 – Priority Non-Tax Claims.

**5.3     Controversy Concerning Classification, Impairment or Voting Rights.**

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Second Amended Plan, prior to the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes the amount of any contingent or unliquidated Claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the Chapter 11 Case.  In addition, the Bankruptcy Court may in accordance with § 506(b) of the Bankruptcy Code conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

## ARTICLE 6
## TREATMENT OF CLAIMS AND EXECUTORY CONTRACTS

**6.1     Treatment of Impaired Classes.**

There are Four (4) classes of impaired claims.

**6.2     Treatment of Unimpaired and Impaired Classes.**

The Unimpaired Classes will be treated as follows:

**6.2.1     Class 1.**  Allowed Priority Non-Tax Claims will be paid in Cash and in full by the Plan Agent on the later of (i) the Initial Distribution Date, (ii) the date on which such Claim becomes an Allowed Claim; or (iii) such other date as the Plan Agent and the holder of the Allowed Claim in Class 1 shall agree.  Allowed Class 1 Claims are not entitled to post-petition interest or post-petition legal fees and expenses.

The Impaired Classes will be treated as follows:

**6.2.2   Class 2.**  Secured Claims shall be paid in full and in Cash by the Plan Agent on the later of (i) the Effective Date; (ii) the date on which such Claim becomes an Allowed Claim; (iii) such other date as the Plan Agent and the Allowed Class 2 shall agree; or (iv) when funds become available from the Plan Agent's liquidation as described in Article 7.

**6.2.3   Class 3.**  The holder of an Allowed General Unsecured Claim in Class 3 shall receive on the later of (i) the Effective Date; (ii) the date on which such Claim becomes an Allowed Claim; (iii) such other date as the Plan Agent and the Allowed Class 3 shall agree;  or (iv) when funds become available from the Plan Agent's liquidation as described in Article 7.

**6.2.4   Class 4.**  The holder of an Allowed Subordinated Claim in Class 4 shall receive on the later of (i) the Effective Date; (ii) the date on which such Claim becomes an Allowed Claim; (iii) such other date as the Plan Agent and the Allowed Class 4 shall agree; or (iv) when funds become available from the Plan Agent's liquidation as described in Article 7.

**6.2.5   Class 5.**  The holder of an Equity Claim shall receive on the later of (i) the Effective Date; (ii) the date on which such Claim becomes an Allowed Claim; (iii) such other date as the Plan Agent and the Allowed Class 5 shall agree; or (iv) when funds become available from the Plan Agent's liquidation as described in Article 7.   If any dispute arises regarding distribution pursuant to applicable law, the Plan Agent shall seek further Order of the Bankruptcy Court to address the distribution to such Equity Claimant.


# ARTICLE 7
## MEANS OF IMPLEMENTATION

**7.1    Transfer.**

The Confirmation Order shall authorize a transfer of all of the Debtor's assets under sections 365, 1123(a)(5), 1123(b)(4), 1129(b)(2)(A), 1141, 1145 and 1146(a) of the Bankruptcy Code free and clear of any Claims, Liens, Interests or encumbrances, including without limitation any Claim or Interest that may be asserted by any Governmental Unit to the Liquidating Debtor.   The Plan Agent shall then seek to either sell, liquidate, or convert the 1.2% IPI Percentage to cash, in such manner as is deemed appropriate by the Plan Agent.   The Plan Agent will institute collection procedures regarding the remaining PIA Deposit and reduce that asset to cash**.**

Upon the sale, liquidation, or conversion of the 1.2% IPI Percentage and/or liquidation of IOC Stock, and liquidation or resolution of the PIA Deposit and remaining assets, all creditors, and Equity Interest Holders of the Debtor, including without limitation all Governmental Units, shall be permanently and forever barred, restrained and enjoined from asserting any Claims or enforcing remedies against the successful purchaser under any theory of successor liability, *de*

*facto* merger or substantial continuity.  All assets shall be transferred "as is, where is" with no representation or warranty of any kind.

**7.2    Vesting of Property of the Estate in the Liquidating Debtor.**

On the Effective Date, all remaining property of the Debtor and of the Estate including all rights to object to Claims, all avoidance actions, causes of action, alter-ego rights, derivative claims, breach of fiduciary duty claims, veil piercing rights, the right to pursue such claims and all other remaining property of the estate as defined in § 541 of the Bankruptcy Code, shall vest in the Liquidating Debtor, free and clear of liens, claims and encumbrances, except as otherwise provided in the Second  Amended Plan.  The Plan Agent shall be the sole officer, director and shareholder of the Liquidating Debtor.  On the Effective Date, the Liquidating Debtor is deemed to have satisfied all liabilities for purposes of dissolution under applicable state law.  The Second Amended Plan Agent is authorized to execute and file all documents necessary to effectuate the dissolution of the Liquidating Debtor once the Plan Agent determines that all Estate property has been administered in accordance with the Second  Amended Plan, including the abandonment of any burdensome property.

**7.3    Continuation of Operations.**

From and after the Effective Date of the Second  Amended Plan, the Liquidating Debtor is authorized to (i) take such action as is necessary to complete an orderly wind-down of its operations; (ii) file claim objections; (iii) make distributions; (iv) prosecute causes of action owned by the Estate, including all claims and causes of action arising under the Bankruptcy Code; (v) pursue, liquidate and administer Estate property; (vi) file tax returns and respond to any audits; and (vii) take such other action as provided for under the Second  Amended Plan.

**7.4    Continued Corporate Existence.**

From and after the Effective Date, the Liquidating Debtor shall continue to exist in accordance with the applicable laws of its state of incorporation/organization.

**7.5    General Powers of the Plan Agent.**

Subject to any express limitations, the Plan Agent, on behalf of the Liquidating Debtor, shall have all of the rights, powers and privileges set forth in the Second  Amended Plan and the Confirmation Order.  The Plan Agent is authorized and shall have the obligation to take all such actions as in his/her judgment are necessary and appropriate to effectuate the purposes of the Second  Amended Plan, including but not limited to the following:

**7.5.1**    Make all Distributions contemplated under the Second  Amended Plan;

**7.5.2**    Consistent with maintaining the value and liquidating the residual assets of the Liquidating Debtor, invest in time or demand deposits, including certificates of deposit issued by any bank approved as a depository institution by the United States Trustee's office, United States Treasury bonds and other securities guaranteed by the full faith and credit of the United States of America or any agency thereof;

**7.5.3**   Supervise and administer the resolution, settlement and payment of Claims and Interests and the distributions to the holders of Allowed Claims and Allowed Interests in accordance with the Second Amended Plan;

**7.5.4**   Enter into any agreement on behalf of the Liquidating Debtor required by or consistent with the Second Amended Plan and perform all of the obligations required of the Plan Agent under the Second Amended Plan;

**7.5.5**   Abandon any of the assets of the Liquidating Debtor if the Plan Agent concludes that such assets are of no benefit to the Creditors or Interest Holders;

**7.5.6**   Participate in or initiate any proceeding before the Bankruptcy Court or any other court of appropriate jurisdiction and participate as a party or otherwise in any administrative, arbitrative, or other non-judicial proceeding and litigate claims on behalf of the Liquidating Debtor, including without limitation all state and federal causes of action or any other litigation which constitute an asset of the Liquidating Debtor and pursue to settlement or judgment;

**7.5.7**   Participate as a party-in-interest in any proceeding before the United States Bankruptcy Court involving the Chapter 11 Case;

**7.5.8**   Act in the name of or in the place of the Liquidating Debtor in any action before the United States Bankruptcy Court or any other judicial or administrative body;

**7.5.9**   Take actions and exercise remedies against any entity that owes money to the Liquidating Debtor, including without limitation, the remedies available under any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document; make compromises regarding any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document; and, declare or waive defaults regarding any deed of trust, security agreement, promissory note, bond, guarantee or other instrument or document;

**7.5.10**  Subject to the limitations provided under Section 7.7, select and employ such professionals, agents or employees as the Plan Agent deems necessary to assist in the administration of the affairs of the Liquidating Debtor and compensate such persons;

**7.5.11**  Hold any unclaimed distribution or payment to the holder of an Allowed Claim in accordance with this Second Amended Plan;

**7.5.12**  Propose any amendment, modification or supplement to this Second Amended Plan or the Liquidating Debtor's governance documents;

**7.5.13**  File dissolution/termination documents with the appropriate governmental agencies to dissolve the Liquidating Debtor once all Distributions have been made pursuant to the Second Amended Plan;

**7.5.14**  Receive, conserve and manage the assets of the Liquidating Debtor and sell or otherwise dispose of such assets for a price and upon such terms and conditions as the

Plan Agent deems most beneficial to the Creditors and Interest Holders and execute such deeds, bills of sale, assignments and other instruments in connection therewith;

**7.5.15**  Open and maintain bank accounts on behalf of or in the name of the Liquidating Debtor;

**7.5.16**  Pay all taxes, make all tax withholdings and file tax returns and tax information returns and make tax elections by and on behalf of the Liquidating Debtor;

**7.5.17**  Pay all lawful expenses, debts, charges and liabilities of the Liquidating Debtor;

**7.5.18**  Enforce all provisions of this Second  Amended Plan;

**7.5.19**  Protect, perfect and defend the title to any of the assets of the Liquidating Debtor and enforce any bonds, mortgages or other obligations or liens owned by the Liquidating Debtor;

**7.5.20**  Carry insurance coverage, including insurance to protect the Liquidating Debtor, the Plan Agent against claims brought against the Liquidating Debtor, the Plan Agent acting within their capacities with the Liquidating Debtor, in such amounts, and to the extent necessary,  as they deem advisable;

**7.5.21**  Establish  such  reserves  for  taxes,  assessments  and  other  expenses  of administration  of  the  Liquidating  Debtor  (including  without  limitation  the  Disputed Claims Reserve) as may be necessary and appropriate for the proper operation of matters incident to the affairs of the Liquidating Debtor; and

**7.5.22**  Exercise  such  other  powers  and  duties  as  are  necessary  or  appropriate  in  the Second  Amended Plan Agent's discretion to accomplish the purposes of the Second Amended Plan.

**7.6**      **Obligations of the Plan Agent.**

Notwithstanding anything in the Plan to the contrary, the Plan Agent shall have the following duties:

**7.6.1**    Subject to the provisions of Section 8.1 and 8.2 of the Second  Amended Plan, the Plan Agent shall be responsible for all material issues affecting the Liquidating Debtor, including the (i) timing and amount of Distributions; (ii) resolution of Claims objections, (iii) the pursuit of Causes of Action, and (iv) the sale and other disposition of assets. Unless an objection is filed, the Plan Agent may take such action without further notice to or approval from any party.

**7.6.2**    The Plan Agent shall subject to Bankruptcy Court approval be solely responsible regarding the retention of, and fee arrangements with professionals representing the Plan Agent and/or Liquidating Debtor.

**7.6.3**   The Plan Agent shall cause to be prepared a quarterly report illustrating (i) receipts and disbursements during the prior quarter, (ii) a schedule of all asset dispositions, (iii) a schedule of Distributions made, and (iv) a summary listing of the status of the resolution of objections to Claims and Causes of Action.  Such quarterly report shall be distributed to any Claimant requesting notice within fifteen (15) business days after the end of the relevant report preparation period.

**7.6.4**   The Plan Agent shall maintain records relating to the Liquidating Debtor's assets, the management thereof and all transactions undertaken by the Plan Agent on behalf of the Liquidating Debtor.  The Plan Agent shall also maintain records and books of account relating to all Distributions contemplated under the Second  Amended Plan.

**7.7    Limitations on the Powers of the Plan Agent.**

**7.7.1**   Notwithstanding anything in this Second  Amended Plan to the contrary, and only with a Bankruptcy Court Order entered after notice and opportunity for hearing may the Plan Agent modify or amend this Second  Amended Plan in accordance with § 1127 of the Bankruptcy Code.

**7.8    Resignation/Removal of the Plan Agent.**

The Plan Agent may resign at any time by filing a written notice of resignation with the Bankruptcy Court.  Any such resignation shall become effective on the earlier to occur of (i) sixty (60) days after the filing date of such notice; or (ii) the appointment of a successor Plan Agent.   All fees and expenses incurred by the Plan Agent in pursuit of the removal or continuation of the Plan Agent shall be the obligation of the Liquidating Debtor.

**7.9    Appointment of Successor Plan Agent.**

In the event of the death, resignation or removal of the Plan Agent, the Court shall designate a successor Plan Agent.  Any successor Plan Agent appointed hereunder shall execute and file a statement accepting such appointment and agreeing to be bound by the terms of the Second  Amended Plan and upon such filing, the successor Plan Agent shall immediately become vested with all the rights, powers, trusts and duties of the Plan Agent.

**7.10    Compensation Procedures.**

The Plan Agent, the Liquidating Debtor,  and all professionals employed by them shall be entitled to payment of their fees and reimbursement of all reasonable expenses on a monthly basis, provided, however, that the Plan Agent shall be provided with written notice of any requested fees and expenses and, if  the Plan Agent objects to such fees and expenses, the Plan Agent must file with the Bankruptcy Court a notice of such objection within 10 days of the Plan Agent's receipt of the written notice of fees and expenses.  If an objection is filed as set forth above, the Bankruptcy Court shall determine whether the disputed fees and/or expenses will be paid by the Plan Agent.

## ARTICLE 8
## CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED CLAIMS/INTERESTS AND PROCEDURES FOR ASSERTING CLAIMS

**8.1     Objection Process.**

Subject to the limitations provided under Article 7, the Plan Agent shall have the right to object to the allowance of any Claims or Interests provided for under the Second Amended Plan. The Plan Agent may object to all claims, whether scheduled or not. The scheduling of a claim or interest as undisputed, non-contingent and/or liquidated by the Debtor shall have no preclusive effect on the Plan Agent. All objections shall be litigated to Final Order; provided, however, that the Plan Agent shall have the authority to compromise, settle or otherwise resolve all objections, for any Claim filed in the amount of $25,000 or less without approval of the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, the Plan Agent shall file and serve all objections to Claims and Equity Interests no later than (i) 120 days after the later of (a) the Effective Date; or (b) the date on which a proof of claim, proof of interest or request for payment is filed with the Bankruptcy Court; or, (ii) such other date as may be approved by the Bankruptcy Court after notice and hearing.

**8.2     Filing of Claims and Causes of Action.**

Subject to the limitations provided under Article 7, the Plan Agent shall have the exclusive right to file and prosecute any Claims and Causes of Action on behalf of the Liquidating Debtor, including all derivative Causes of Action. The Plan Agent shall have the authority to compromise, settle or otherwise resolve all Claims and Causes of Action filed or asserted in the amount of $25,000 or less without approval of the Bankruptcy Court.

**8.3     Disputed Claims Reserve.**

A Disputed Claims Reserve shall be established by the Plan Agent for the treatment of Disputed Claims. The Plan Agent shall deposit into a Disputed Claims Reserve an amount equal to the Pro Rata share of the Distribution allocable to such Disputed Claims, in accordance with the distribution scheme contemplated in the Second Amended Plan, as if such Claims and/or Equity Interests were Allowed Claims or Equity Interests. Amounts deposited into the Disputed Claims Reserve shall be held in trust for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Second Amended Plan. Once such Disputed Claim is determined by Final Order or settlement to be an Allowed Claim, Plan Agent is authorized to pay the Allowed Amount of such Claim without further approval from or notice to any person or entity.

**8.4     Distributions to Holders of Disputed Claims and Disputed Interests.**

Within 10 Business Days after such time as a Disputed Claim becomes an Allowed Claim, but in no event earlier than the Initial Distribution Date, any Distributions reserved for such Allowed Claim shall be released from the Disputed Claims Reserve and delivered to the holder of such Allowed Claim in an amount proportionate to the Allowed Amount of any such Claim. In the event that the Disputed Claim is disallowed in whole or in part, or otherwise settled in amount less than the Disputed Claim amount, the disallowed or reduced portion of such Claim shall be distributed from the Disputed Claim Reserve to holders of Allowed Claims as

Available Cash on the next Interim Distribution Date in accordance with the Plan without further approval from or notice to any person or entity.

**8.5     Disallowance of Late Filed Proofs of Claim.**

Except as otherwise provided in the Second Amended Plan, any proof of claim filed by the holder of such Claim after the Bar Date is hereby disallowed without further notice.

**8.6     Provisions Governing Distributions.**

**8.6.1     Record Date for Claims and Equity Interests.**

The record date for Distributions to Allowed Claims and Allowed Interests under the Plan shall be the date the Bankruptcy Court enters its order approving the Disclosure Statement.  For purposes of Distributions to holders of Allowed Claims, the Plan Agent will rely on the claims docket maintained by the Clerk for proofs of claim filed in the Chapter 11 Case except to the extent a notice of transfer of Claim or Interest has been filed with the Court prior to the record date pursuant to Bankruptcy Rule 3001.  For purposes of Distributions on account of Equity Interests, the Plan Agent will rely on the relevant stock transfer ledger(s).

**8.6.2     Delivery of Distributions to Holders of Allowed Claims.**

Subject to Bankruptcy Rule 9010, Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth on the proofs of claim filed by such holders, or at the last known address of such holder if no proof of claim is filed, unless the holder of the Allowed Claim has otherwise notified the Plan Agent in writing of a change of address.  If any holder's Distribution is returned as undeliverable, it will be treated in accordance with Article 8.6.4 herein.  The Plan Agent may, but shall not be required to make any Distribution of less than $25.00.

**8.6.3     Delivery of Distributions to Holders of Allowed Equity Interests.**

Distributions to holders of Allowed Equity Interests, to the extent they are entitled to distributions under the Second Amended Plan, will be made at the address of the registered holder of each such Equity Interest as set forth in the relevant stock transfer ledger(s).  If any holder's distribution is returned as undeliverable, it will be treated in accordance with Article 8.6.4 herein.  The Plan Agent may, but shall not be required to make any Distribution of less than $25.00.

**8.6.4     Unclaimed Distributions.**

The Plan Agent shall file a Notice of Distribution within 10 Business Days of the date on which Distributions are made under the Plan.  All claims for undeliverable Distributions must be made no later than the 60th day following the date that the Notice of Distribution is filed.  After such date, all unclaimed Distributions will revert to the Liquidating Debtor for distribution in accordance with this Second Amended Plan and the remaining Claim or Equity Interest of any holder with respect to such Distribution will be discharged and forever barred.

### 8.6.5   Uncashed Checks.

Checks issued in respect of Allowed Claims and/or Equity Interests will be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Distributions with respect to such un-negotiated checks will revert to the Liquidating Debtor for distribution in accordance with this Second Amended Plan and the remaining Claim or Equity Interest of any holder with respect to such Distribution will be discharged and forever barred.

## ARTICLE 9
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1     Rejection of Executory Contracts and Unexpired Leases.**

All executory contracts and unexpired leases that are not assumed under this Second Amended Plan are rejected, unless otherwise dealt with by the Second Amended Plan or the Confirmation Order, or any other Order of the Court entered prior to the Effective Date, or which is the subject of a motion to assume pending on the Effective Date.

**9.2     Assumed Executory Contracts and Unexpired Leases.**

Each executory contract and unexpired lease that is assumed will include (a) all amendments, modifications, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease; and (b) with respect to any executory contract or unexpired lease that relates to the use, ability to acquire, or occupancy of real property, all executory contracts or unexpired leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements have been rejected pursuant to an order of the Bankruptcy Court or are the subject of a motion to reject filed on or before the Confirmation Date.   Amendments, modifications, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during its Chapter 11 Case shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**9.3     Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Damages arising from the rejection of an executory contract or unexpired lease to which the Debtor is or was a party shall be a General Unsecured Claim against the Debtor unless subordinated under applicable law.   Any Claim for damages arising from the rejection of an executory contract or unexpired lease must be asserted in a proof of claim filed with the Bankruptcy Court no later than 20 days following the earlier of: (a) the date of entry of an order of the Bankruptcy Court approving such rejection, or (b) the Effective Date of the Second Amended Plan.   Any Claims not filed within such times shall be forever barred from assertion against the Debtor, the Liquidating Debtor or the Plan Agent.

**9.4     Reservation of Rights.**

Nothing contained in the Second Amended Plan shall constitute an admission by the Debtor that any such contract or lease is in fact an executory contract or unexpired lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Plan Agent shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE 10**
**EFFECT OF CONFIRMATION**

**10.1     Legally Binding Effect.**

The provisions of the Second Amended Plan shall bind all Creditors and Interest Holders, whether or not they accept the Second Amended Plan.  On and after the Effective Date, all holders of Claims shall be precluded and enjoined from (i) asserting any Claim against the Debtor, the Liquidating Debtor or their assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date except as permitted under the Second Amended Plan; (ii) asserting any derivative claims, including claims against third parties asserting alter ego claims, fraudulent transfer claims or any other type of successor liability; and (iii) otherwise interfering with the Plan Agent/Liquidating Debtor's administration of assets and claims under the Second Amended Plan.   The entry of the Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all Claims and Interests dealt with under the Second Amended Plan and all pending legal proceedings, if any, against the Debtor and its assets and properties and any proceedings not yet instituted against the Debtor or its assets and properties, except as otherwise provided in the Second Amended Plan, concerning Claims and Interests dealt with under the Second Amended Plan.  Unless otherwise provided in the Second Amended Plan or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in these cases pursuant to § 105, if any, or § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until the Effective Date.

**10.2     Limited Protection of Certain Parties in Interest.**

Except as specifically limited herein, the Debtor and the Estate shall release under the Second Amended Plan (a) the Plan Agent, the Liquidating Debtor and all of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, and any other professional persons employed by the Plan Agent and the Liquidating Debtor, (b) each Professional for the Debtor and any of its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, and any other professional persons employed by any of them, (c) and any other professional persons employed by them (the persons identified in (a), (b), and (c)  are collectively referred to as "Protected Persons," and, notwithstanding anything to the contrary herein, any and all claims and causes of action against Protected Persons, or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any them, for gross negligence or willful misconduct shall be fully preserved.

### 10.3    Indemnification.

The Liquidating Debtor shall indemnify each Person identified as a Protected Person against any and all costs and expenses (including attorneys' fees) incurred by any of them in defending against post-Confirmation Date claims released pursuant to Article 11.2 of the Second Amended Plan; provided, however, that no Protected Person shall be entitled to indemnification under this Second  Amended Plan for the costs and expenses of defending a cause of action in which it is ultimately judicially determined that such Protected Person was grossly negligent or acted fraudulently or with willful misconduct in performing such Protected Person's duties hereunder or under any Final Order of the Bankruptcy Court or applicable law, or *ultra vires* activity.  Any Protected Person entitled to indemnification under this section shall have a priority distribution right that is senior to the holders of Allowed General Unsecured Claims against the Liquidating Debtor.  The Plan Agent may, in his sole discretion, use the Liquidating Debtor's assets (as an expense of consummating this Second  Amended Plan) to purchase indemnification insurance to satisfy any potential indemnification claims that may arise under this section.

### 10.4    Preservation of Claims and Rights.

Confirmation of this Second  Amended Plan effects no settlement, compromise, waiver or release of any Claim, Cause of Action, Right of Action or claim for relief unless this Second Amended Plan or the Confirmation Order specifically and unambiguously so provides.  The non-disclosure or non-discussion of any particular Claim, Cause of Action, Right of Action or claim for relief is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim, Cause of Action, Right of Action or claim for relief.

**The Debtor, the Liquidating Debtor and the Plan Agent reserve any and all claims and rights against any and all third parties, whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, the Record Date and/or any Distribution date, including, without limitation, any and all Causes of Action, Rights of Action and/or claims for relief that the Debtor, the Liquidating Debtor or the Plan Agent has against (i) any insurer and/or insurance policies in which either the Debtor and/or their current or former personnel have an insurable or other interest in or right to make a claim against, any other of the Debtor's insurers; (ii) any recipient of a transfer identified in the Debtor's statements of financial affairs, including any amendments thereto, filed in this Chapter 11 Case; and (iii) for claims of breach of fiduciary duty, fraudulent transfer, preferential transfer, unauthorized post-petition transfer under 11 U.S.C. § 549, turnover under 11 U.S.C. §§ 542 and 543, subordination, re-characterization of debt to equity, malpractice, constructive trust, disgorgement, counter-claims, claims to determine the extent and validity of liens under 11 U.S.C. § 506 and any other claims that the Estate may have against such Non-Released Parties.  The entry of the Confirmation Order shall not constitute *res judicata* or otherwise bar, estop or inhibit any actions by the Debtor, the Liquidating Debtor or the Plan Agent relating to any claims, Causes of Action or Rights of Action referred to in this Article 10.6, or otherwise.  Except as specifically set forth herein, the Plan Agent shall constitute the representative of the Estate for purposes of retaining, asserting and/or enforcing Rights of Action under § 1123(b)(3)(B) of the Bankruptcy Code.  On the Effective Date, the Plan Agent shall be substituted as a party of record in all pending litigation brought by or against the Debtor without need for further order of the Bankruptcy Court.**

## ARTICLE 11
## CONFIRMATION OF THE SECOND  AMENDED PLAN

**11.1    Confirmation Hearing.**

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Second  Amended Plan ("Confirmation Hearing").  The Confirmation Hearing has been scheduled before the Honorable David R. Jones, Chief United States Bankruptcy Judge, on **December 3, 2014 at 9:00 a.m.** (Houston time), in Courtroom No. 400, 4th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002.   The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) provides that any party in interest may object to confirmation of the Second  Amended Plan.   However, an impaired Creditor, who votes to accept the Second Amended Plan, may not have standing to object to the Second  Amended Plan.   Objections to confirmation of the Second  Amended Plan are governed by Bankruptcy Rule 9014 and any applicable Local Rules of the Bankruptcy Court.   **The deadline for filing objections to confirmation of the Second  Amended Plan is November 17, 2014 at 5:00 p.m. (Houston time)**.  Objections to confirmation must be filed with the Clerk of Court.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**11.2    Statutory Requirements for Confirmation of the Second  Amended Plan.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Second  Amended Plan.  As set forth in § 1129 of the Bankruptcy Code, these requirements are as follows:

1.      The Second  Amended Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponent of the Second  Amended Plan complies with the applicable provisions of the Bankruptcy Code.

3.      The Second  Amended Plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or to be made by the Second  Amended Plan proponent, or by a person issuing securities or acquiring property under the Second  Amended Plan, for services or for costs and expenses in, or in connection with the cases, or in connection with the Second Amended Plan and incident to the cases, has been approved by, or is subject to the approval of, the Court as reasonable.

5.      The proponent of the Second  Amended Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Second  Amended Plan,

as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint Second Amended Plan with the Debtor, or a successor to the Debtor under the Second Amended Plan; and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and with public policy; and the proponent of the Second Amended Plan has disclosed the identity of any insider that will be employed or retained by the Debtor, and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtor, has approved any rate change provided for in the Second Amended Plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each class of impaired claims or equity interests:

(a)      each holder of a claim or interest of such class:

(i)  has accepted the Second  Amended Plan; or

(ii)  will receive or retain under the Second  Amended Plan on account of such claim or interest property of a value, as of the effective date of the Second  Amended Plan, that is not less than the amount that such holder would so receive or retain if the Plan Proponent were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b)      if § 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the Second  Amended Plan on account of such claim property of a value, as of the effective date of the Second  Amended Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secured such claims.

8.      With respect to each class of claims or interests:

(a)      such class has accepted the Second  Amended Plan; or

(b)      such class is not impaired under the Second  Amended Plan;

9.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Second  Amended Plan provides that:

(a)      with respect to a claim of a kind specified in § 507(a)(1) or § 507(a)(2) of the Bankruptcy Code, on the effective date of the Second  Amended Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)      with respect to a class of claims of a kind specified in §§ 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i)      if such class has accepted the Second  Amended Plan, deferred cash payments of a value, as of the effective date of the Second  Amended Plan, equal to the allowed amount of such claim; or

(ii)      if such class has not accepted the Second  Amended Plan, cash on the effective date of the Second  Amended Plan equal to the allowed amount of such claim; and

(c)      with respect to a claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the Second  Amended Plan, equal to the allowed amount of such claim.

10.      If a class is impaired under the Second  Amended Plan, at least one class of claims that is impaired has accepted the Second  Amended Plan, determined without including any acceptance of the Second  Amended Plan by any insider.

11.      Confirmation of the Second  Amended Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the plan proponent or any successor to the plan proponent under the Second  Amended Plan, unless such liquidation or reorganization is proposed in the Second  Amended Plan.

The Debtor believes that the Second   Amended Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposal of the Second Amended Plan is made in good faith.

The Debtor further believes that the holders of all Claims impaired under the Second Amended Plan will receive payments or distributions under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtor were liquidated in a case under Chapter 7 of the Bankruptcy Code.

Finally, as the Second  Amended Plan contemplates a sale of the Debtor's operating assets, the Debtor does not believe that the confirmation of the Second  Amended Plan will likely be followed by the need for further financial reorganization of the Debtor.

## 11.3    Cramdown.

In the event that any impaired class of Claims does not accept the Second  Amended Plan, the Bankruptcy Court may still confirm the Second  Amended Plan if, as to each impaired class which has not accepted the Second  Amended Plan, the Second  Amended Plan does not discriminate unfairly and is "fair and equitable."  A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in § 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

1.      With respect to a class of secured claims, the Second Amended Plan provides:

      (a)     (i) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Plan Proponent or transferred to another entity, to the extent of the allowed amount of such claims; and

      (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Second Amended Plan, of at least the value of such holder's interest in the estate's interest in such property;

      (b)     for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or

      (c)     for the realization by such holders of the indubitable equivalent of such claims.

2.      With respect to a class of unsecured claims, the Second Amended Plan provides:

      (a)     that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the Second Amended Plan, equal to the allowed amount of such claim; or

      (b)     the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the Second Amended Plan on account of such junior claim or interest any property.

3.      With respect to a class of interests, the Second Amended Plan provides:

      (a)     that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the Second Amended Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

      (b)     the holder of any interest that is junior to the interests of such class will not receive or retain under the Second Amended Plan on account of such junior interest any property.

The Bankruptcy Court will determine at the Confirmation Hearing whether the Second Amended Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired class of Claims. The Debtor believes that the Bankruptcy Court will find these requirements satisfactory and will confirm the Second Amended Plan.

**11.4    Conditions Precedent to Effective Date.**

      **11.4.1**    The following are conditions precedent to the occurrence of the Effective Date: (i) the Confirmation Order, in a form and in substance reasonably satisfactory to the shall have been entered by the Bankruptcy Court; (ii) the form of all documents necessary or appropriate to give effect to the transactions contemplated under the Second  Amended Plan, if any, have been approved and executed; (iii) all required consents, approvals, and authorizations, if any, have been obtained; (iv) there shall be no stay of the Confirmation Order in effect; (v) the Plan Agent shall have determined the Liquidating Debtor is holding good and available funds for payment of Claims under the Second  Amended Plan and (vi) all other actions, documents and agreements necessary to implement the Second  Amended Plan shall have been effected or executed.

      The Effective Date is defined in the Second  Amended Plan as the day selected by the Debtor that is no earlier than the first Business Day after (i) the date the Confirmation Order has been entered; and (ii) all conditions specified in Article 13 of the Second  Amended Plan have been satisfied or waived.

**11.5    Annulment of Second  Amended Plan if Conditions Not Waived or Satisfied.**

      The Debtor reserves the right to waive any of the conditions precedent to the Effective Date.  If any of the conditions precedent are not waived, and are not satisfied within six months of the Confirmation Date or can no longer occur, the Debtor shall convert the Chapter 11 Case to chapter 7 and any proceeds shall be administered by a chapter 7 trustee.

**11.6    Retention of Jurisdiction by Bankruptcy Court.**

      The Court shall retain and have exclusive jurisdiction over this Chapter 11 Case to the maximum extent provided by law for the follow purposes following the Confirmation Date: (a) to determine any and all objections to the allowance and classification of Claims or Interests; (b) to determine the validity and priority of any Lien; (c) to determine the Allowed Amount of any Claim, whether secured or unsecured; (d) to allow any and all applications for allowances of compensation and reimbursement of expenses payable from the estate; (e) to determine any and all applications or motions pending before the Court on the Effective Date of the Second Amended Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any executory contract or unexpired lease; (f) to consider and approve any modification of the Second  Amended Plan, remedy any defect or omission or reconcile any inconsistency in the Second  Amended Plan, or any order of the Court, including the Confirmation Order; (g) to hear and determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Second Amended Plan, the Confirmation Order, any transactions or payments contemplated hereby or any agreement, instrument or other document governing or related to any of the foregoing; (h) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor; (i) to issue orders in aid of execution and implementation of the Second  Amended Plan and the Confirmation Order, to the extent authorized by 11 U.S.C. § 1142 or provided by the terms of the Second  Amended Plan; and (j) to hear and determine matters concerning federal, state or local taxes in accordance with §§ 346, 505 or 1146 of the Bankruptcy Code.

In no event shall the provisions of the Second Amended Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334.

## ARTICLE 12
## COMPROMISES AND SETTLEMENTS

**12.1    Effect of Confirmation Order.**

Pursuant to Bankruptcy Rule 9019 and applicable provisions of the Bankruptcy Code, and in consideration for the classification, distribution and other benefits provided under the Second Amended Plan, the provisions of the Second Amended Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Second Amended Plan, including, without limitation, all Claims arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtor. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Second Amended Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

**13.1    Bar Date for Administrative Claims.**

No Administrative Claim, other than Professional Fees, United States Trustee fees and, if applicable, the Expense Reimbursement, will be paid unless the holder of such Administrative Claim has filed an application for payment of such Administrative Claim on or before the Administrative Claim Bar Date. Upon the filing of any application for payment, the entity seeking payment of an Administrative Claim shall provide notice by United States Mail in accordance with the Bankruptcy Rules. Any Administrative Claim, other than Professional Fees, United States Trustee fees and, if applicable, not filed in accordance with this section shall be barred and the Debtor, the Liquidating Debtor and the Plan Agent shall have no liability for payment of any such Administrative Claim.

**13.2    Objections to Administrative Claims.**

Objections to Applications for payment of Administrative Claims may be filed by any party in interest. In order to be considered, such objections must be filed on or before the 21st day following the date on which the application was filed. Any objections will be determined by the Bankruptcy Court.

**13.3    Payment of Professional Claims.**

Each holder of a Professional Fee Claim shall be paid in respect of such Professional Fee Claim in Cash, in full, on the Effective Date, or, if such Claim has not been approved by the

Bankruptcy Court on or before the Effective Date, promptly after Bankruptcy Court approval of the Professional Fee Claim by a Final Order.  Final fee applications for any Professional Fee Claim that has not been approved as of the Effective Date shall be filed within 45 days of the Effective Date and such applications and objections thereto (if any) shall be filed in accordance with and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, applicable local rules.  The failure to file an application by the foregoing deadline shall constitute a waiver of all such Professional Fee Claim.

**13.4    Payment of United States Trustee Fees.**

Within 30 days of the date that such payments are due, the Debtor or the Liquidating Debtor shall pay all amounts owing to the United States Trustee as fees and costs imposed in connection with this Chapter 11 Case.

**13.5    Directive to State Agencies.**

At such time as any of the Liquidating Debtor files articles of dissolution, all governmental agencies are directed to accept such articles and recognize the dissolution of the Liquidating Debtor regardless of whether all Claims, including taxes have been paid in full.

**13.6    Satisfaction of Liabilities.**

The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction and release of all Claims and Interests of any nature whatsoever against the Debtor and/or the Estate, as well as assets, properties, and interests in property of the Debtor and/or the Estate.  The Liquidating Debtor shall not be responsible for any pre-Effective Date obligations of the Debtor except those expressly assumed by the Liquidating Debtor.

**13.7    Warranty of Transfers from Liquidating Debtor.**

All property, whether real or personal, to be transferred by the Plan Agent on behalf of the Liquidating Debtor to any person or entity under this Second  Amended Plan, is transferred "as is, where is," with no representation or warranty of any kind except that all transfers shall be transferred free and clear of all liens, claims and encumbrances pursuant to the applicable provisions of the Bankruptcy Code, including 11 U.S.C. § 1123(a)(5).

**13.8    Compliance with Tax Requirements.**

In connection with each distribution with respect to which the filing of an information return (such as an Internal Revenue Service Form 1099 or 1042) or withholding is required, the Plan Agent shall file such information return with the Internal Revenue Service and provide any required statements in connection therewith to the recipients of such distribution or effect any such withholding and deposit all moneys so withheld as required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Plan Agent within thirty (30) days from the date of such request, the Plan Agent may, at his option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received.

**13.9    Amendment of the Second  Amended Plan.**

This Second  Amended Plan may be amended or modified by the Debtor before, or by the Plan Agent after the Effective Date, as provided in § 1127 of the Bankruptcy Code.

**13.10    Timing of Distributions.**

Unless otherwise specified herein, all payments and Distributions shall be made on an Interim Distribution Date determined by the Plan Agent.  When a provision of this Second Amended Plan requires that a payment shall be made on a certain date, such payment may be made (i) at any time prior to the date on which such payment is due; (ii) in more frequent intervals than set forth in such provision of the Second  Amended Plan; or (iii) not more than 14 days after the date any such payment is due.  Notwithstanding the foregoing, no payment shall be considered late or otherwise result in a default unless the Plan Agent has failed to make the payment after the passage of 30 days following the receipt by the Plan Agent of a written notice advising that a payment has not been received in accordance with the times set forth in this paragraph.

**13.11    Enforcement of Subordination Agreements/Settlement Agreements.**

Any written (i) subordination agreement between holders of Allowed Claims; and (ii) settlements approved by the Bankruptcy Court during this Chapter 11 Case will be honored according to their terms for the purposes of distribution under this Second  Amended Plan.

**13.12    Filing of Documents in Public Records.**

Pursuant to § 1146 of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making of an instrument of transfer under this Second  Amended Plan (including without limitation the filing of any mortgage, deed of trust, security agreement, uniform commercial code financing statement or other similar document) shall not be taxed under any law imposing a stamp tax or similar tax.  All state or local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for Filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**13.13    Right to Seek Further Orders.**

The Plan Agent, if and to the extent necessary, will seek such orders, judgments, injunctions, regulatory approvals, and rulings that may be required to carry out and further the intentions and purposes, and give full effect to the provisions, of the Second Amended Plan.

**13.14    Regulatory Approvals.**

As the Second Amended Plan is not intended to modify or supplant any regulatory authority over the Debtor or the Liquidating Debtor, all regulatory approvals required in connection with the Second Amended Plan will be sought and obtained.

**13.15    Withdrawal of Plan.**

The Debtor reserves the right to withdraw this Second Amended Plan at any time prior to the Confirmation Date.

**13.16    Due Authorization by Creditors.**

Each and every Creditor who elects to participate in the Distributions provided for herein (i) warrants that it is authorized to accept in consideration of its Claim against the Debtor the Distributions provided for in this Second Amended Plan; (ii) states that there are no outstanding commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights conveyed or obligations undertaken by it under this Second Amended Plan; and (iii) indemnifies and holds harmless the Liquidating Debtor, the Plan Agent and their professionals and representatives with respect to such Distributions.

**13.17    Filing of Additional Documentation.**

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Second Amended Plan.

**13.18    Implementation.**

The Debtor, the Liquidating Debtor and the Plan Agent shall be authorized to perform all reasonable, necessary and authorized acts to consummate the terms and conditions of the Second Amended Plan.

**13.19    Substantial Consummation.**

On the Effective Date, the Second Amended Plan shall be deemed to be substantially consummated under Bankruptcy Code §§ 1101 and 1127(b).

**13.20   Further Effect of Confirmation.**

Confirmation of this Second Amended Plan effects no settlement, compromise, waiver or release of any Claim or cause of action unless this Plan or the Confirmation Order specifically so provides. The non-disclosure or non-discussion of any particular Claim or cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim or cause of action.

**13.21   Dates.**

The provisions of Bankruptcy Rule 9006 shall govern the calculation of any dates or deadlines referenced in the Second Amended Plan.

**13.22   Governing Law.**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Second Amended Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to any conflicts of law principles.

**13.23   Conflict.**

Except as otherwise provided in the Second Amended Plan, to the extent the Confirmation Order and/or this Second Amended Plan are inconsistent with the Disclosure Statement, any other agreement entered into between the Debtor and any third party, the Second Amended Plan controls the Disclosure Statement and any such agreements and the Confirmation Order (and any other orders of the Bankruptcy Court) controls the Second Amended Plan.

**13.24   Severability.**

The Plan Agent may, but shall not be required to, set off against any Claims and the payments or Distributions to be made pursuant to the Second Amended Plan in respect of such Claims, any and all debts, liabilities and claims of every type and nature whatsoever that the Estate or the Liquidating Debtor may have against the Holder of any Claim, but neither the failure to do so nor the Allowance of any such Claims, whether pursuant to the Second Amended Plan or otherwise, shall constitute a waiver or release by the Plan Agent or the Liquidating Debtor of any such claims they may have against such Holder of any Claim, and all such claims shall be reserved for and retained by the Plan Agent.

**13.25   Setoffs.**

The Plan Agent may, but shall not be required to, set off against any Claims and the payments or Distributions to be made pursuant to the Second Amended Plan in respect of such Claims, any and all debts, liabilities and claims of every type and nature whatsoever that the Estate or the Liquidating Debtor may have against the Holder of any Claim, but neither the failure to do so nor the Allowance of any such Claims, whether pursuant to the Second Amended Plan or otherwise, shall constitute a waiver or release by the Plan Agent or the

Liquidating Debtor of any such claims they may have against such Holder of any Claim, and all such claims shall be reserved for and retained by the Plan Agent.

**13.26   Other Considerations.**

The Second  Amended Plan affords holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders.  If the Second  Amended Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the Chapter 11 Case; (b) alternative plans of reorganization/liquidation; (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code; and (d) dismissal of the Chapter 11 Case.

**13.27   Feasibility of the Second  Amended Plan.**

Pursuant to the Second  Amended Plan, the Debtor proposes to sell all of its assets the proceeds of the sale and all of the Debtor's remaining property will be vested in the Liquidating Debtor and administered by the Plan Agent for the benefit of holders of Allowed Claims and Interests pursuant to the terms of the Second  Amended Plan.  Inasmuch as the Second  Amended Plan is based on the sale/liquidation of assets, the Second  Amended Plan is feasible.

**13.28   Continuation of the Case.**

The Debtor will cease operations and the sales proceeds and all remaining assets will be administered by the Plan Agent pursuant to the Terms of the Second  Amended Plan.  There is no strategic or economic advantage to continuing the case for any significant period of time.  To the contrary, the Debtor believes that in view of the current situation, Creditors will best be served by the rapid resolution of this bankruptcy case.

**13.29   Alternative Plans of Liquidation.**

If the Second  Amended Plan is not confirmed, the Debtor or another party in interest in the case could attempt to formulate and propose a different plan or plans.  Such plans might, theoretically, involve some other form of reorganization or liquidation of the Debtor's operations and assets.  Any alternative plans, however, would likely result in additional administrative expenses to the estate and would provide little or no benefit.  The Second  Amended Plan proposed by the Debtor is straightforward, meets the requirements of § 1129 and provides the best outcome for Creditors.

**13.30   Liquidation under Chapter 7.**

The Debtor does not believe that the case should be converted to Chapter 7.  Conversion to Chapter 7 would result in the loss of the going concern value of the Debtor as well as the additional administrative expenses attributable to statutory trustee fees and professional fees for the trustee's professionals.  To the contrary, under the Second  Amended Plan, several million dollars in cash will likely be available for the payment of administrative, priority and other unsecured claims.  If the true amount of Claims is close to that scheduled by the Debtor as undisputed, General Unsecured Creditors could receive 100% on their claims.  This is an estimate only and constitutes the Debtor's best guess based upon the data currently available.

**13.31   Risk Factors.**

Both failure to achieve confirmation of the Second  Amended Plan, and consummation of the Second  Amended Plan, are subject to certain risks.  First, the effectiveness of the Second Amended Plan is contingent on closing the successful sale, liquidation, or conversion of the IPI Working Interest and, if converted, the viability of IOC stock.  Sale of any converted IOC stock is subject to market fluctuations beyond the control of the Debtor and the Liquidating Debtor and the Plan Agent.   A number of factors can impact the liquidation of the PIA Deposit including factors that are outside of the Debtor's control.  While the Debtor believes that liquidation of its assets is likely, there is always some risk involved in the type of transaction that is contemplated.

In addition, there are certain risks inherent in the liquidation and administration process under the Bankruptcy Code.  If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Second  Amended Plan even if Creditors and Interest holders accept the Second  Amended Plan.   Although the Debtor believes that the Second Amended Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtor to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan.   The Debtor believes that the solicitation of votes on the Second  Amended Plan will comply with § 1126(b) and that the Bankruptcy Court will confirm the Second  Amended Plan.  The Debtor cannot, however, provide assurance that modifications of the Second   Amended Plan will not be required to obtain confirmation of the Second Amended Plan, or that such modifications will not require a re-solicitation of acceptances.

**13.32   Taxation.**

**13.32.1        Introduction.**

The following discussion summarizes certain federal income tax consequences of the transactions described herein and in the Second  Amended Plan.   This discussion is for informational purposes only and does not constitute tax advice.  This summary is based upon the Internal Revenue Code and the Treasury Regulations promulgated thereunder, including judicial authority and current administrative rulings and practice as of the date of this Second  Amended Disclosure Statement and will not be updated for subsequent tax or factual developments.  Neither the impact on foreign holders of claims and equity interests nor the tax consequences of these transactions under state and local law is discussed.  Also, special tax considerations not discussed herein may be applicable to certain classes of taxpayers, such as financial institutions, broker-dealers, insurance companies, mutual funds, regulated investment companies, real estate investment trusts, trusts, S corporations, dealers and traders in securities and currencies, partnerships and other entities classified as partnerships for federal tax purposes and tax-exempt organizations.   Furthermore, due to the complexity of the transactions contemplated in the Second   Amended Plan, and the unsettled status of many of the tax issues involved, the tax consequences described below are subject to significant uncertainties including subsequent legislative and other tax changes.  No opinion of counsel has been obtained and no ruling has been requested from the Internal Revenue Service ("IRS") on these or any other tax issues. There can be no assurance that the IRS will not challenge any or all of the tax consequences of the Second  Amended Plan, or that such a challenge, if asserted, would not be sustained. **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING**

**THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE SECOND AMENDED PLAN.**

### 13.32.2    Tax Consequences to the Debtor and Equity Interest Holders.

The Debtor may realize cancellation of indebtedness ("COI") income in respect of each Claim generally in an amount equal to the excess, if any, of (i) the portion of the Claim (including accrued and previously deducted but unpaid interest) from which the Debtor is (or is deemed to be) discharged; and (ii) the sum of any cash or the "issue price," under the Internal Revenue Code of 1986 (the "Internal Revenue Code") §§ 1273(b) and 1274, of any debt obligations distributed under the Second Amended Plan in discharge of such Claims. The exact amount of COI income realized upon consummation of the Second Amended Plan has not been finally determined. Under the Internal Revenue Code, a taxpayer is generally required to include COI income in gross income. COI income is not includable in gross income, however, if it occurs in a case under the Bankruptcy Code, provided the taxpayer is under the jurisdiction of a Court in such case and the cancellation of indebtedness is granted by the Court or is pursuant to a plan approved by the Court. The Debtor's COI income, if any, resulting from the Second Amended Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtor. COI income that is excluded from gross income will reduce certain tax attributes of the taxpayer, including net operating loss suspended under Internal Revenue Code Section 1361(d) (hereinafter "NOLs") carryovers, capital loss carryovers and the tax basis of assets, in a specified order of priority beginning with the NOLs and NOL carryovers, unless the taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. The reduction of tax basis is limited to the excess of (i) the aggregate of the tax bases of the taxpayer's property (determined immediately after the discharge); and (ii) the aggregate liabilities of the taxpayer (determined immediately after the discharge). The exclusion for COI is deemed to occur immediately following the end of the Debtor's tax year, and not during the tax year.

The Debtor may recognize gain or loss on the sale of assets to third parties equal to the sales price of such assets less the Debtor's adjusted tax basis in such properties. The sales price includes all indebtedness assumed by a buyer as well as all other consideration received by the Debtor. The amount and tax character of such gain and loss will depend on the applicable facts and circumstances.

To the extent any proceeds from the sale of assets of the Debtor remain after satisfaction of all Allowed Claims and Interests in accordance with the Bankruptcy Code, the Plan Agent will distribute any remaining amounts to the Equity Interest Holders of Debtor. It is anticipated that any such distributions will be treated as redemptions for U.S. federal income tax purposes, with gain or loss resulting to each such Equity Interest Holder on the difference between the amount so distributed to such Equity Interest Holder and such Equity Interest Holder's U.S. federal income tax basis in their Debtor shares redeemed or deemed redeemed in connection with such distribution. Such gain or loss will as a general matter likely constitute a capital gain or loss, and individual Equity Interest Holders of Debtor who have held their shares in Debtor to which such distributions relate for in excess of one (1) year may be entitled to reduced long-term capital gain rates.

### 13.32.3       Tax Consequences to Creditors.

**In General**.  The federal income tax consequences of the implementation of the Second Amended Plan to a holder of a Claim will depend, among other things, on: (a) whether its Claim constitutes a debt or security for federal income tax purposes, (b) whether the Claimant receives consideration in more than one tax year, (c) whether the Claimant is a resident of the United States, (d) whether all the consideration by the Claimant is deemed to be received by that Claimant as part of an integrated transaction, (e) whether the Claimant utilizes the accrual or cash method of accounting for tax purposes, and (f) whether the holder has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.

**Gain or Loss on Exchange**.  Generally, a holder of an Allowed Claim will realize a gain or loss on the exchange under the Second  Amended Plan of his Allowed Claim for cash and other property in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to accrued but unpaid interest on the Allowed Claim), and (ii) the adjusted basis of the Allowed Claim exchanged therefore (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest or accrued market discount, as described below) if the Claim was a capital asset in the hand of an exchanging holder, and such gain would be a long-term capital gain if the holder's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

The tax treatment of an Allowed Claim for accrued unpaid interest will depend on the Claimant's tax basis in such Claim, which primarily depends on whether the Claimant has previously recognized income for the accrual of such interest and/or recognized a loss with respect to same.  Any such holders should consult with their tax advisors regarding the tax treatment of any such accrued unpaid interest.

Any loss recognized by a holder of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset. For this purpose, a "security" is a debt instrument with interest coupons or in registered form.

### 13.32.4       Information Reporting and Backup Withholding.

Under the backup withholding rules of the Internal Revenue Code, holders of Claims and Equity Interest Holders may be subject to backup withholding with respect to payments made pursuant to the Second  Amended Plan unless such holder (i) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income.  Any amount withheld under these rules will be credited against the holder's federal income tax liability.  Holders of Claims and Equity Interests may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### 13.32.5      Importance of Obtaining Professional Assistance.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN MANY AREAS, UNCERTAIN. TO COMPLY WITH TREASURY DEPARTMENT CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS SECOND AMENDED DISCLOSURE STATEMENT, THE SECOND AMENDED PLAN OR ANY RELATED MATERIALS, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; AND (B) ANY SUCH DISCUSSIONS ARE BEING USED ONLY IN CONNECTION WITH SATISFYING THE REQUIREMENTS IMPOSED UNDER THE BANKRUPTCY CODE FOR DISCLOSURE STATEMENTS, AND (C) YOU SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR WITH RESPECT TO YOUR FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES BASED ON YOUR PARTICULAR CIRCUMSTANCES.**

### ARTICLE 14
### CAUSES OF ACTION

### 14.1    Preferences.

Under the Bankruptcy Code, the Debtor may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of their bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the Debtor been liquidated under Chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period. There are certain defenses to such recoveries. Transfers made in the ordinary course of the Debtor's and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable. Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property. If a transfer is recovered by the Debtor, the transferee has a General Unsecured Claim to the extent of the recovery. The Liquidating Trustee reserves the right to bring preferential transfer claims against any party receiving transfers within 90 days of the Petition Date.

### 14.2    Fraudulent Transfers.

Under the Bankruptcy Code and various state laws, the Debtor may recover certain transfers of property, including the grant of a security interest in property, made while insolvent or which rendered the Debtor insolvent. The Plan Agent reserves the right to bring fraudulent conveyance claims.

The Debtor has conducted a limited analysis of potential recoveries under Chapter 5 of the Bankruptcy Code and concluded that potential claims may exist. A list of the known payments are set forth in the Debtor's statements of financial affairs, which are incorporated

herein.   In addition, all secured creditors scheduled as "disputed" in the Debtor's Amended Schedule D are subject to claims for fraudulent transfer and/or preference on account of their asserted security interests.   Creditors and Interest Holders are advised that if they received a voidable transfer, they may be sued whether or not they vote to accept the Second  Amended Plan.  All avoidance actions and rights pursuant to §§ 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 and 724 of the Bankruptcy Code and all causes of action under state, federal or other applicable law shall be retained and may be prosecuted or settled by the Plan Agent in her sole discretion.  To the extent that material amounts are recovered, it will enhance the returns to the holders of Unsecured Claims.

**14.3    Other Causes of Action.**

As set forth herein, the Debtor believes that claims may exist against certain of the Debtor's former officers, directors and professionals.  These claims will be evaluated, pursued and resolved by the Plan Agent in its sole discretion.

**ARTICLE 15**
**VOTING PROCEDURES AND REQUIREMENTS**

**15.1    Ballots and Voting Deadline.**

A ballot to be used to vote to accept or reject the Second  Amended Plan is enclosed with this Disclosure Statement.  A Creditor who is voting must (1) carefully review the ballot and instructions thereon, (2) complete and execute the ballot indicating the Creditor's vote to either accept or reject the Second  Amended Plan, and (3) return the executed ballot to the address indicated thereon by the deadline specified by the Bankruptcy Court.

**The Bankruptcy Court has directed that, to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by Debtor's counsel no later than November 17, 2014  at 5:00 p.m. (Houston Time).**

If you hold an impaired Claim against the Debtor, return your ballot to:

**FUQUA & ASSOCIATES, PC**
RICHARD L. FUQUA

5005 RIVERWAY, SUITE 250
HOUSTON, TEXAS 77056
(713) 960-0277
(713) 960-1064 (facsimile)
Email: rlfuqua@fuqualegal.com

**TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED**
**NO LATER THAN 5:00 P.M. (HOUSTON TIME) ON NOVEMBER 17, 2014**

**15.2    Creditors Entitled to Vote.**

All impaired creditors are entitled to vote.

Any Creditor whose Claim is impaired under the Second Amended Plan is entitled to vote, if either (i) the Debtor has scheduled its Claim on its Statement of Liabilities and such Claim is not scheduled as disputed, contingent or unliquidated, or (ii) such Creditor has filed a Proof of Claim on or before the last date set by the Bankruptcy Court for filing Proofs of Claim and no objection has been filed to such Claim.

Holders of Disputed Claims are not entitled to vote on the Second Amended Plan. Any Claim to which an objection has been filed and remains pending, is not entitled to vote unless the Bankruptcy Court, upon motion by the Creditor who holds a Disputed Claim, temporarily allows the Claim in an amount that it deems proper for accepting or rejecting the Second Amended Plan. Any such motion must be heard and determined by the Bankruptcy Court before the date established by the Bankruptcy Court as the final date to vote on the Second Amended Plan. In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Second Amended Plan by the Creditor was not solicited or obtained in good faith or according to the provisions of the Bankruptcy Code.

Classes of Claims that are not impaired are deemed to have accepted a plan of reorganization pursuant to § 1126(f) and, therefore, are not entitled to vote on a plan. Pursuant to § 1126, only classes of claims or interests that are "impaired" are entitled to vote on a plan of reorganization. Generally, a claim is impaired if the plan of reorganization alters the legal, equitable, or contractual rights to which the holder of such claim is otherwise entitled.

## 15.3   Voting Procedures.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, revocation, or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, and the Debtor's determination will be final and binding. The Debtor also reserves the right to reject any Ballot not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor further reserves the right to waive any defects or irregularities or conditions or delivery as to any particular Ballot. The interpretation by the Debtor of the provisions of this Second Amended Disclosure Statement and the Ballots will be final and binding on all parties in interest unless otherwise directed by the Bankruptcy Court. Unless waived, any defects or irregularities concerning deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determine. Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liability for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of Ballots will not be deemed to have been made and will be invalidated unless or until all defects and irregularities have been timely cured or waived.

## 15.4   Vote Required for Class Acceptance.

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Claims as the acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half in number of the allowed Claims of the class actually voting to accept or reject the proposed plan.

The Bankruptcy Code defines acceptance of a chapter 11 plan by a class of Interests as the acceptance by holders of at least two-thirds (2/3) in amount of the allowed Interests in the class actually voting to accept or reject the proposed plan.

**15.5    Cramdown and Withdrawal of the Second  Amended Plan.**

If the Second  Amended Plan is not accepted by all classes of impaired Creditors, the Debtor reserves the right to withdraw the Second  Amended Plan.  If the Second  Amended Plan is accepted by one or more Classes of impaired Creditors of the Debtor, the Debtor reserves the right to request the Bankruptcy Court to approve the Second  Amended Plan under 11 U.S.C. § 1129(b).

**THE DEBTOR STRONGLY URGES ALL IMPAIRED CREDITORS TO VOTE TO ACCEPT THE PLAN**.

**Date: October 2, 2014.**

**Helia Tec Resources, Inc.**

By: /s/ Cary E. Hughes, President
Name:  Cary E. Hughes
Title:    President

## CERTIFICATE

I hereby certify that the Second Amended Disclosure Statement, as modified in open Court  at the hearing held on October 1, 2014,  was electronically filed on October 2, 2014.

*/s/ Richard L. Fuqua*

Richard L. Fuqua